**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

---

Nos. 26-1150 and 26-1454

---

GABRIEL ANTONIO BUELE MOROCHO

v.

WARDEN PHILADELPHIA FDC; ACTING DIRECTOR PHILADELPHIA FIELD OFFICE IMMIGRATION AND CUSTOMS ENFORCEMENT; SECRETARY U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. DEPARTMENT OF HOMELAND SECURITY; ATTORNEY GENERAL UNITED STATES OF AMERICA; EXECUTIVE OFFICE FOR IMMIGRATION REVIEW,
Appellants

WANDERSON LOPES DE ANDRADE

v.

DIRECTOR PHILADELPHIA FIELD OFFICE IMMIGRATION AND CUSTOMS ENFORCEMENT; WARDEN PHILADELPHIA FDC,
Appellants

---

On Appeal from the U.S. District Court

for the Eastern District of Pennsylvania
No. 2:25-cv-05930 (Hon. John M. Gallagher)
No. 2:26-cv-00603 (Hon. Mary Kay Costello)

---

Argued May 11, 2026

Before: SHWARTZ, MASCOTT, and McKEE, Circuit Judges.

(Filed: August 28, 2026)

---

OPINION

---

Kiley L. Kane, Esq.
John F. Stanton, Esq.
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC 20044

Charles E.T. Roberts, Esq. [ARGUED]
United States Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530

Counsel for Appellants

Mana Aliabadi, Esq.

Christopher M. Casazza, Esq.
Palladino Isbell & Casazza
1528 Walnut Street
Suite 1701
Philadelphia, PA 19102

My Khanh Ngo, Esq.
Michael K.T. Tan, Esq. [ARGUED]
American Civil Liberties Union Foundation
Immigrants Rights Project
425 California Street
7th Floor
San Francisco, CA 94104

Farrin R. Anello, Esq.
Ezra D. Rosenberg, Esq.
American Civil Liberties Union of New Jersey
P.O. Box 32159
Newark, NJ 07102

Vanessa Stine, Esq.
American Civil Liberties Union of Pennsylvania
P.O. Box 60173
Philadelphia, PA 19102

Witold J. Walczak, Esq.
American Civil Liberties Union
P.O. Box 23058
Pittsburgh, PA 15222

Counsel for Appellees

Gillian Barna, Esq.

Office of Attorney General of New York
28 Liberty Street
19th Floor
New York, NY 10005

Counsel for Amici California, New York, Arizona, Colorado, Connecticut, Delaware, Hawai'i, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, Oregon, Rhode Island, Vermont, Virginia, and Washington

Emma C. Winger, Esq.
American Immigration Council
Suite 500
2001 L Street NW
Pmb2026
Washington, DC 20036

Counsel for Amici American Immigration Council, American Immigration Lawyers Association

Brianne J. Gorod, Esq.
Constitutional Accountability Center
1200 18th Street NW
Suite 501
Washington, DC 20036

Counsel for Amicus Constitutional Accountability Center

Amit Jain, Esq.
Roderick & Solange MacArthur Justice Center
501 H Street NE

Suite 275
Washington, DC 20002

Counsel for Amicus Immigration Law Scholars

Linda H. Martin, Esq.
Baker Botts
30 Rockefeller Plaza
44th Floor
New York, NY 10112

Counsel for Amici Former Immigration Judges and Appellate Immigration Judges

SHWARTZ, Circuit Judge.

The Government appeals the District Courts' orders to release Gabriel Antonio Buele Morocho and Wanderson Lopes De Andrade (together, "Petitioners") who had been held in immigration custody without a bond hearing. Because their detentions without hearings violated the Immigration and Nationality Act ("INA") and due process, we will affirm.

I

Buele Morocho, a citizen of Ecuador, and Lopes De Andrade, a citizen of Brazil, entered the United States without inspection in 2001 and 2014, respectively. In late 2025 and early 2026, respectively, they were arrested by United States Immigration and Customs Enforcement and detained without bond under 8 U.S.C. § 1225(b)(2)(A).

Petitioners' detention under § 1225(b)(2)(A) was a shift in the Government's enforcement of the INA. Until 2025, apprehended noncitizens[1] like Petitioners—namely, those who had already entered the United States without inspection and been present for years[2]—were detained or released under 8 U.S.C. § 1226(a). Unlike § 1225(b)(2)(A), § 1226(a) permits discretionary release on bond pending removal proceedings so long as the noncitizen is not a danger or flight risk.[3] See 8 U.S.C. § 1226(a)(2); 8 C.F.R. § 1236.1(c)(8). In 2025, the Government began using § 1225(b)(2)(A) to detain, without bond, noncitizens already in the United States who had entered without inspection. See Matter of Yajure Hurtado, 29 I. & N. Dec. 216, 220-28 (BIA 2025).

---

[1] Although the statutes frequently use the term "aliens," we will describe those subject to our immigration laws in this context as "noncitizens." See Nasrallah v. Barr, 590 U.S. 573, 578 n.2 (2020) ("This opinion uses the term 'noncitizen' as equivalent to the statutory term 'alien.'"); B.C. v. Att'y Gen. U.S., 12 F.4th 306, 308 n.2 (3d Cir. 2021) ("We use the term 'noncitizen' as equivalent to the statutory term 'alien.'"); Guerrero Orellana v. Moniz, 25-2152, ---F.4th---, 2026 WL 2352042, at *4 n.6 (1st Cir. Aug. 13, 2026) (same); Lopez-Campos v. Raycraft, 175 F.4th 713, 719 n.1 (6th Cir. 2026) (same); Santillan Quiroz v. Mullin, 180 F.4th 1226, 1234 n.2 (10th Cir. 2026) (same).

[2] Petitioners' Notices to Appear described them as "alien[s] present in the United States who ha[ve] not been admitted or paroled." App. 46, 77.

[3] Section 1226(c), which imposes mandatory detention of certain noncitizens in the United States who have committed enumerated criminal offenses, is not applicable here. 8 U.S.C. § 1226(c).

Like many other noncitizens now mandatorily detained under § 1225(b)(2)(A), Petitioners sought habeas relief under 28 U.S.C. § 2241, alleging their detentions violated the INA. The District Court granted both petitions, holding that § 1225(b)(2)(A) did not apply to Petitioners and their continued detentions without bond violated the INA. See Buele Morocho v. Jamison, No. 5:25-CV-05930-JMG, 2025 WL 3296300, at *3 (E.D. Pa. Nov. 26, 2025); Lopes de Andrade v. Rose, No. 26-603, 2026 WL 401189, at *4-5 (E.D. Pa. Feb. 12, 2026). The Lopes de Andrade Court further held that his detention violated the Fifth Amendment's Due Process Clause. 2026 WL 401189, at *6. Both Petitioners were released.

The Government appeals.

## II[4]

### A

To decide this case, we must interpret § 1225(b)(2)(A). "Our first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997). "The plainness or ambiguity of statutory language is determined by reference to

---

[4] The District Courts had jurisdiction under 28 U.S.C. §§ 1331 and 2241, and we have jurisdiction under 28 U.S.C. § 1291. German Santos v. Warden Pike Cnty. Corr. Facility, 965 F.3d 203, 208 (3d Cir. 2020). We review the District Courts' legal conclusions de novo. Albrecht v. Horn, 485 F.3d 103, 114 (3d Cir. 2007).

the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." Id. at 341. "[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." Lamie v. U.S. Tr., 540 U.S. 526, 534 (2004) (citation omitted).

Section 1225(b)(2)(A) provides that "in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a [removal] proceeding under section 1229a of this title." 8 U.S.C. § 1225(b)(2)(A). Thus, § 1225(b)(2)(A) imposes mandatory detention if: (1) an "examining immigration officer," (2) determines that an "applicant for admission," (3) is "an alien seeking admission," and (4) is "not clearly and beyond a doubt entitled to be admitted."[5] Id. The crux of the dispute before us is whether an "applicant for admission" is necessarily "seeking admission."

Nine of our sister courts have already considered this issue. The Courts of Appeals for the First, Second, Sixth, Seventh, Ninth, Tenth, and Eleventh Circuits determined that mandatory detention of similarly-situated petitioners under § 1225(b)(2)(A) is unlawful. Guerrero Orellana v. Moniz, 25-2152, 2026 WL 2352042, at *1 (1st Cir. Aug. 13, 2026);

[5] Our sister courts have dissected § 1225(b)(2)(A) to similar elements. See, e.g., Barbosa da Cunha v. Freden, 175 F.4th 61, 74 (2d Cir. 2026); Hernandez Alvarez v. Warden, Fed. Det. Ctr. Miami, 175 F.4th 1258, 1269 (11th Cir. 2026).

Barbosa da Cunha v. Freden, 175 F.4th 61, 84 (2d Cir. 2026), petition for cert. filed, No. 26-104 (U.S. July 23, 2026); Lopez-Campos v. Raycraft, 175 F.4th 713, 722 (6th Cir. 2026), petition for cert. filed, No. 25-1415 (U.S. June 22, 2026); Cirrus Rojas v. Olson, 25-3127, ---F.4th---, 2026 WL 2198315, at *2 (7th Cir. July 30, 2026);[6] Rodriguez Vazquez v. Bostock, No. 25-6842, ---F.4th---, 2026 WL 2196424, at *3 (9th Cir. July 30, 2026); Santillan Quiroz v. Mullin, 180 F.4th 1226, 1250-51 (10th Cir. 2026); Hernandez Alvarez v. Warden, Fed. Det. Ctr. Miami, 175 F.4th 1258, 1262 (11th Cir. 2026). The Courts of Appeals for the Fifth and Eighth Circuits have held that § 1225(b)(2)(A) requires mandatory detention of individuals like Petitioners here. Buenrostro-Mendez v. Bondi, 166 F.4th 494, 503 (5th Cir. 2026), petition for cert. filed, No. 26-43 (U.S. July 2, 2026); Avila v. Bondi, 170 F.4th 1128, 1134 (8th Cir. 2026).

B

Congress defined "applicant for admission" in § 1225(a)(1), which provides "[a]n alien present in the United States who has not been admitted or who arrives in the United States . . . shall be deemed for purposes of this chapter an

---

[6] Previously, a divided panel of the Court of Appeals for the Seventh Circuit did not reach a controlling holding on this issue, see Castañon-Nava v. U.S. Dep't of Homeland Sec., 175 F.4th 828 (7th Cir. 2026), though a prior panel in reviewing a motion to stay determined § 1225(b)(2)(A) was inapplicable to petitioners like those here, see Castañon-Nava v. U.S. Dep't of Homeland Sec., 161 F.4th 1048, 1061-62 (7th Cir. 2025).

applicant for admission."[7] A noncitizen is deemed "admitted" following "lawful entry . . . after inspection and authorization

---

[7] To the extent the Government contends that Congress did not define "applicant for admission" in § 1225(a)(1) because it used the word "deemed" in describing who qualified as an applicant for admission, "[t]his is a distinction without a difference." Lopez-Campos, 175 F.4th at 728. By explaining what criteria constitute an "applicant for admission," Congress provided a definition. See Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz, 601 U.S. 42, 59 (2024) ("When Congress takes the trouble to define the terms it uses, a court must respect its definitions as 'virtually conclusive.'" (citation omitted)). Moreover, nearly every Circuit Court to have addressed this issue has stated § 1225(a)(1) defines "applicant for admission." See Barbosa da Cunha, 175 F.4th at 74 ("'[A]pplicant for admission' is defined by statute to mean any noncitizen who is present in the United States and has not been admitted, or is arriving in the United States."); Buenrostro-Mendez v. Bondi, 166 F.4th 494, 499 (5th Cir. 2026) (discussing "[a]liens who meet [§ 1225(a)(1)'s] statutory definition"); Lopez-Campos, 175 F.4th at 728 ("Congress defined 'applicant for admission' in § 1225(a)(1) . . . ."); Avila v. Bondi, 170 F.4th 1128, 1133 (8th Cir. 2026) ("In defining [applicant for admission], § 1225(a)(1) reads as follows . . . ."); Hernandez Alvarez, 175 F.4th at 1267 ("Section 1225(a)(1) defines [applicant for admission] . . . ."); Cirrus Rojas v. Olson, 25-3127, ---F.4th---, 2026 WL 2198315, at *8 (7th Cir. July 30, 2026) (same).

Thus, we disagree "that Congress did not sufficiently indicate to us the obscure statutory meaning of 'applicant for admission' such that we may then use ordinary meanings to determine its definition." Lopez-Campos, 175 F.4th at 729.

by an immigration officer." 8 U.S.C. § 1101(a)(13)(A); see also Mullin v. Al Otro Lado, 146 S. Ct. 2079, 2087 (2026) (recognizing the same definition); Guerrero Orellana, ---F.4th---, 2026 WL 2352042, at *6 (same); Barbosa da Cunha, 175 F.4th at 75 (same); Lopez-Campos, 175 F.4th at 722 (same); Cirrus Rojas, ---F.4th---, 2026 WL 2198315, at *5 (same); Rodriguez Vazquez, ---F.4th---, 2026 WL 2196424, at *11; Hernandez Alvarez, 175 F.4th at 1268 (same). Petitioners are "applicants for admission" under this definition because they are present in the United States without having been lawfully admitted and inspected by an immigration officer. See Barbosa da Cunha, 175 F.4th at 74 (classifying similarly situated petitioners as "applicant[s] for admission"); Guerrero Orellana, ---F.4th---, 2026 WL 2352042, at *5 (same); Cirrus Rojas, ---F.4th---, 2026 WL 2198315, at *5 (same); Santillan Quiroz, 180 F.4th at 1237 (same); Hernandez Alvarez, 175 F.4th at 1269 (same). This classification, however, covers only one part of § 1225(b)(2)(A). For the statute to apply to Petitioners, each must also be "an alien seeking admission."[8]

---

We are not recognizing a legal fiction but rather are simply applying the statutory definition provided by Congress.

[8] Because courts must conduct their own statutory analysis, see Loper Bright Enters. v. Raimondo, 603 U.S. 369, 412 (2024); Miller Plastic Prods. Inc v. NLRB, 141 F.4th 492, 503 (3d Cir. 2025), we will not defer to the Board of Immigration Appeals' recent interpretation of § 1225(b)(2)(A) as applying to noncitizens like Petitioners and its reasoning that such "applicants for admission" are necessarily "seeking admission," Matter of Yajure Hurtado, 29 I. & N. Dec. 216, 221 (BIA 2025).

Congress has not defined "seeking admission." As a result, we look to its ordinary meaning. See Feliciano v. Dep't of Transp., 605 U.S. 38, 45 (2025); see also Barbosa da Cunha, 175 F.4th at 76 (relying on ordinary meaning of "seeking"); Guerrero Orellana, ---F.4th---, 2026 WL 2352042, at *6 (same); Lopez-Campos, 175 F.4th at 723 (same); Cirrus Rojas, ---F.4th---, 2026 WL 2198315, at *7 (same); Rodriguez Vazquez, ---F.4th---, 2026 WL 2196424, at *13 (same); Santillan Quiroz, 180 F.4th at 1238 (same); Hernandez Alvarez, 175 F.4th at 1266 (same). "Seeking" is defined as "ask[ing] for" or "try[ing] to acquire or gain." Seek, New English Dictionary of the English Language 2266 (2d ed. 1952); accord Seek, Merriam-Webster's Collegiate Dictionary 1057 (10th ed. 1996); see also Barbosa da Cunha, 175 F.4th at 74 (relying on similar definitions); Guerrero Orellana, ---F.4th---, 2026 WL 2352042, at *6 (same); Lopez-Campos, 175 F.4th at 722-23 (same); Cirrus Rojas, ---F.4th---, 2026 WL 2198315, at *5 (same); Rodriguez Vazquez, ---F.4th---, 2026 WL 2196424, at *11 (same); Santillan Quiroz, 180 F.4th at 1238 (same); Hernandez Alvarez, 175 F.4th at 1267-68 (same). Congress's decision to use the verb in its present participle form—"seeking"—suggests it contemplated a current or ongoing action. See United States v. Wilson, 503 U.S. 329, 333 (1992) ("Congress'[s] use of a verb tense is significant in construing statutes."); see also Barbosa da Cunha, 175 F.4th at 74 ("The term 'seeking' is in the present participle form, which expresses present action."); Hernandez Alvarez, 175 F.4th at 1268 ("That the word is written as a present participle ('seeking') underscores that it is describing some active and temporally ongoing step or process on the part of the alien."); Guerrero Orellana, ---F.4th---, 2026 WL 2352042, at *6 n.10 (same); Lopez-Campos, 175 F.4th at 723 (same); Rodriguez Vazquez, ---F.4th---, 2026 WL 2196424, at

*11 (same); Santillan Quiroz, 180 F.4th at 1238 (same); cf. United States v. Hull, 456 F.3d 133, 145 (3d Cir. 2006) (Ackerman, J., concurring) ("Congress's use of the present participle 'committing' connotes present, continuing action."). Thus, to fall within § 1225(b)(2)(A)'s ambit, an "applicant for admission" must engage in present or ongoing action to gain "admission," that is, "lawful entry . . . into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A). In other words, for § 1225(b)(2)(A) to apply, the noncitizen must do more than be an "applicant for admission."[9] See Barbosa da Cunha, 175 F.4th at 78 (recognizing § 1225(b)(2)(A) applies only to those who are both "applicants for admission" and "seeking admission"); Lopez-Campos, 175 F.4th at 723 (same); Cirrus Rojas, ---F.4th---, 2026 WL 2198315, at *7 (same); Hernandez Alvarez, 175 F.4th at 1269 (same).

Holding otherwise would render the phrase "seeking admission" surplusage. "It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so

---

[9] This understanding is bolstered by § 1225(a)(4), which provides that "[a]n alien applying for admission may . . . be permitted to withdraw the application for admission and depart immediately from the United States." 8 U.S.C. § 1225(a)(4). If those "applying" for—or in other words "seeking"—admission are entitled to "withdraw" their applications, then they must have taken an affirmative action that can be withdrawn. See Barbosa da Cunha, 175 F.4th at 80 ("There is simply no reason for a noncitizen who unlawfully entered twenty years ago to request permission from the Attorney General to 'withdraw' anything, because he never submitted anything in the first place.").

construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001) (citation omitted). If an "applicant for admission" were necessarily "seeking admission," then it would be unnecessary for § 1225(b)(2)(A) to specify that the noncitizen is "seeking admission."[10] Its

---

[10] The Government insists that even if its reading results in some redundancy, its interpretation is correct because "[r]edundancy in one portion of a statute is not a license to rewrite or eviscerate another portion of the statute contrary to its text." Appellants' Br. at 33-34 (quoting Barton v. Barr, 590 U.S. 222, 239 (2020)). By recognizing the independent significance of "seeking admission," however, we ensure that all terms of the statute are given meaning. TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001) (citations omitted); Tavarez v. Klingensmith, 372 F.3d 188, 190 (3d Cir. 2004) ("If possible, we must 'give effect . . . to every clause and word of a statute.'" (quoting Duncan v. Walker, 533 U.S. 167, 174 (2001)); see also Hernandez Alvarez, 175 F.4th at 1272 ("Doubtless, redundancies in law can happen, and where otherwise clear text steers us toward repetition, we need not veer out of the way—especially when the redundant phrases are synonymous. But here, the plain text cuts against the Government." (citation omitted)).

True, "if forced to choose between an interpretation that entails some redundancy and one that contradicts what words usually mean, we would choose the former." Mullin v. Al Otro Lado, 146 S. Ct. 2079, 2094 (2026). We are not presented with such a situation here, however, because our interpretation of "seeking admission" is in accord with its ordinary meaning.

presence shows that it has independent meaning.[11] See United States v. Yung, 37 F.4th 70, 79 (3d Cir. 2022) ("Normally, where Congress uses different words, we read those words to have different meanings." (citing Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 170 (2012)); see also Lopez-Campos, 175 F.4th at 723

---

[11] Not all those present in the United States without authorization seek lawful admission, even if they are attempting to remain in the country. For example, those seeking asylum are not requesting lawful admission, but rather seek relief from removal. Indeed, as the Supreme Court has instructed:

> Lawful status and admission . . . are distinct concepts . . . . On the one hand, a foreign national can be admitted but not in lawful status—think of someone who legally entered the United States on a student visa, but stayed in the country long past graduation. On the other hand, a foreign national can be in lawful status but not admitted—think of someone who entered the country unlawfully, but then received asylum.

Sanchez v. Mayorkas, 593 U.S. 409, 415 (2021); see also Lopez-Campos, 175 F.4th at 729 ("'[A] foreign national can be in lawful status but not admitted,' such as individuals who receive asylum or temporary protected status." (quoting Sanchez, 593 U.S. at 415-416)); Hernandez Alvarez, 175 F.4th at 1269 ("[I]t is indisputable that there are many other ways to be lawfully present in the United States under the INA, without having been lawfully admitted into this country."); Guerrero Orellana, ---F.4th---, 2026 WL 2352042, at *15 & n.27 (same); Barbosa da Cunha, 175 F.4th at 80-81 (same); Cirrus Rojas, ---F.4th---, 2026 WL 2198315, at *7 (same).

("Congress's decision to employ the phrase 'seeking admission' implies a meaning distinct from the defined phrase 'applicant for admission.'"); Guerrero Orellana, ---F.4th---, 2026 WL 2352042, at *10 (same); Barbosa da Cunha, 175 F.4th at 75 (same); Cirrus Rojas, ---F.4th---, 2026 WL 2198315, at *10 (same); Rodriguez Vazquez, ---F.4th---, 2026 WL 2196424, at *13; Santillan Quiroz, 180 F.4th at 1240-41 (same); Hernandez Alvarez, 175 F.4th at 1269 (same).[12] By including this language, Congress specified what an "applicant for admission" must do to be subject to § 1225(b)(2)(A), namely engage in an ongoing affirmative act to "seek[] admission" to the United States.[13] Because Petitioners are not

[12] The Government suggests that if § 1225(b)(2)(A) applies only to those "seeking admission," "then § 1225(b)(1) swallows § 1225(b)(2)." Reply Br. at 10. Not so. "Section 1225(b)(1) applies to aliens initially determined to be inadmissible due to fraud, misrepresentation, or lack of valid documentation . . . [and] other aliens designated by the Attorney General in his discretion." Jennings v. Rodriguez, 583 U.S. 281, 287 (2018). Those noncitizens are generally subject to "expedited removal." Id. Section 1225(b)(2)(A), on the other hand, applies to other noncitizens "seeking admission" who do not fall under § 1225(b)(1)'s purview and are "not clearly and beyond a doubt entitled to be admitted." § 1225(b)(2)(A). Thus, our reading recognizes the independent force of each provision. See Santillan Quiroz, 180 F.4th at 1245 ("[S]ubsection (b)(1) serves an important function at the border that subsection (b)(2)(A) does not.").

[13] See Sw. Airlines Co. v. Saxon, 596 U.S. 450, 457-58 (2022) ("[W]here [a] document has used one term in one place, and a materially dif ferent term in another,

the presumption is that the different term denotes a different i dea." (quoting Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 170 (2012) (alteration in original)).

taking such action,[14] they are not within the scope of § 1225(b)(2)(A).[15] See Lopez-Campos, 175 F.4th at 732

---

[14] To support its interpretation, the Government points to § 1225(a)(3), which provides that "[a]ll aliens . . . who are applicants for admission or otherwise seeking admission or readmission . . . shall be inspected." 8 U.S.C. § 1225(a)(3). "[O]r otherwise," the Government contends, serves as a catchall that renders being an "applicant for admission" one of several ways to "seek admission." The Government misreads the statute.

As a preliminary matter, the Government's interpretation of § 1225(a)(3) does not negate the plain meaning of § 1225(b)(2)(A), which, as we have explained, establishes that "applicant for admission" and "seeking admission" have independent meanings. See Hernandez Alvarez, 175 F.4th at 1273 ("The most the inspection provision of § 1225(a)(3) can offer is further illumination of the relationship between 'applicant for admission' and 'seeking admission.' By insisting that we must effectively read 'seeking admission' out of § 1225(b)(2)(A) on account of language found in a different provision, the Government offers a reading that fails to produce a 'harmonious whole.'" (quoting FTC v. Mandel Bros., Inc., 359 U.S. 385, 389 (1959))).

Even then, "or otherwise" has two meanings. "Otherwise" as a standalone term can mean "in a different way or manner." Otherwise, Merriam-Webster's Collegiate Dictionary 823-24 (10th ed. 1994). "Or otherwise" can also be "used to refer to something that is different from something already mentioned." Or Otherwise, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/or%20otherwise (last visited Mar. 30, 2026); see also Barbosa da Cunha, 175 F.4th at 78 ("Although

the [G]overnment is correct that 'or otherwise' can sometimes mean 'in a different way or manner,' it can also simply 'refer to something that is different from something already mentioned.'" (citation omitted)); Guerrero Orellana, ---F.4th---, 2026 WL 2352042, at *12-13 (same); Santillan Quiroz, 180 F.4th at 1244-45 (same); Cirrus Rojas, ---F.4th---, 2026 WL 2198315, at *9 (same); Hernandez Alvarez, 175 F.4th at 1273 (same). This is particularly true where the words preceding "or otherwise" do not "set forth a list of specific examples," as is the case here. Barbosa da Cunha, 175 F.4th at 79; cf. Ali v. Fed. Bureau of Prisons, 552 U.S. 214, 225 (2008) (observing that "a list of specific items separated by commas and followed by a general or collective term" suggests that "Congress remained focused on the common attribute when it used the catchall phrase"). Section 1225(a)(3) does not list several ways of "seeking admission," but rather merely states that "applicants for admission" and those "seeking admission" are subject to inspection—this use of "or otherwise" does not support the Government's position. See Lopez-Campos, 175 F.4th at 727 ("'Otherwise,' as used in § 1225(a)(3), is better understood as 'one of . . . several distinct and independent' qualifiers rather than 'a general or collective term following a list of specific items to which a particular statutory command is applicable.'" (quoting United States v. Aguilar, 515 U.S. 593, 615 (1995) (Scalia, J., concurring in part and dissenting in part) (alteration in original))); Barbosa da Cunha, 175 F.4th at 80 ("Section 1225(a)(3) applies to applicants for admission, and also applies to three further categories of noncitizens, which may overlap with but are not the same as 'applicant for admission.'"); Rodriguez Vazquez v. Bostock, No. 25-6842, ---F.4th---, 2026 WL 2196424, at *16 (9th Cir. July 30, 2026) (same); Hernandez Alvarez, 175 F.4th at 1273-75 (same).

[15] It follows from Congress's definition of "applicants for admission" that not all applicants for admission are "seeking admission" to the United States. Courts have offered helpful analogies that explain why:

> [S]omeone who enters a movie theater without purchasing a ticket and then proceeds to sit through the first few minutes of a film would not ordinarily then be described as "seeking admission" to the theater. Rather, that person would be described as already present there. Even if that person, after being detected, offered to pay for a ticket, one would not ordinarily describe them as "seeking admission" (or "seeking" "lawful entry") at that point—one would say that they had entered unlawfully but now seek a lawful means of remaining there.

Lopez Benitez v. Francis, 795 F. Supp. 3d 475, 489 (S.D.N.Y. 2025); Barbosa da Cunha, 175 F.4th at 76 ("If someone sneaks into Yankee Stadium [a baseball stadium] at the start of the game with no ticket for admission (and no intention of ever paying) and he is later found by security in a seat in the seventh inning, no one would consider that fan to be 'seeking admission' to the game."); see also Al Otro Lado, 146 S. Ct. at 2090 (relying on "[e]veryday examples" to determine ordinary meaning of term). Because Petitioners here have engaged in no affirmative act to "seek[] admission" to the United States, § 1225(b)(2)(A) does not apply.

The Court of Appeals for the Fifth Circuit suggests that the above analogies over-complicate the issue—they contend that "[j]ust as an applicant to a college seeks admission, an applicant for admission to the United States is 'seeking admission' to the same, regardless whether the person actively

("Because no Petitioner is alleged to be seeking admission or lawful entry into the United States, § 1225(b)(2)(A)'s mandatory detention scheme does not apply to them."); Rodriguez Vazquez, ---F.4th---, 2026 WL 2196424, at *14 ("[W]e do not think an alien present in the interior of the United

---

engages in further affirmative acts to gain admission." Buenrostro-Mendez, 166 F.4th at 502. This reasoning is inapt because Congress has given "applicant for admission" a specific definition that does not include the phrase "seeking admission." 8 U.S.C. § 1225(a)(1); see Kirtz, 601 U.S. at 59 ("When Congress takes the trouble to define the terms it uses, a court must respect its definitions as 'virtually conclusive.'" (citation omitted)); see also Barbosa da Cunha, 175 F.4th at 76 ("It is precisely because Congress employed a statutory term of art for 'applicant for admission' but not for 'seeking admission' that the analogy to an applicant for college, relied upon heavily by the government and our two sister circuits, is inapposite."); Guerrero Orellana, ---F.4th---, 2026 WL 2352042, at *10 & n.17 (same); Lopez-Campos, 175 F.4th at 729 (same); Cirrus Rojas, ---F.4th---, 2026 WL 2198315, at *8 (same); Rodriguez Vazquez, ---F.4th---, 2026 WL 2196424, at *15 (same); Santillan Quiroz, 180 F.4th at 1241 (same); Hernandez Alvarez, 175 F.4th at 1270 (same).

We recognize the Government's view has superficial appeal, namely, that it seems natural that an "applicant for admission" is indeed "seeking admission," but that is not what Congress said.

Furthermore, our definition of "seeking admission" does not redefine "applicant for admission," as that term is used in Chapter 12. The phrase "seeking admission" simply describes the act an "applicant for admission" must undertake to be covered by § 1225(b)(2)(A).

States remains in the perpetual state of seeking admission (that is, seeking entry) . . . ."); Guerrero Orellana, ---F.4th---, 2026 WL 2352042, at *6 (same); Barbosa da Cunha, 175 F.4th at 78 (same); Cirrus Rojas, ---F.4th---, 2026 WL 2198315, at *7 (same); Santillan Quiroz, 180 F.4th at 1238 (same); Hernandez Alvarez, 175 F.4th at 1269 (same).[16]

The statute contains another indication that "applicant for admission" and "seeking admission" are separate elements. Congress used the word "an" in the phrase "an alien seeking admission." Using the indefinite article "an" rather than a definite article, such as "the," which would refer back to the initially-described individual, further shows that "an applicant for admission" and "an alien seeking admission" refer to different things. See U.S. Sugar Corp. v. EPA, 113 F.4th 984, 993 (D.C. Cir. 2024) ("Congress's choice between a definite

---

[16] 8 U.S.C. § 1101(a)(13)(C), which provides that "[a]n alien lawfully admitted for permanent residence in the United States shall not be regarded as seeking an admission" except in several specific circumstances, does not disturb this conclusion as the provision is inapt. As explained in Lopez-Campos, "[i]f anything, § 1101(a)(13)(C)'s discrete exceptions prove that Congress knew how to explicitly define certain LPRs present in the country as 'seeking an admission' but chose not to do so for all other noncitizens who are also present in the country." 175 F.4th at 730; see also Santillan Quiroz, 180 F.4th at 1239 n.8 (given the context of it usage, "§ 1101(a)(13)(C) is a specific statutory carveout that applies only to lawful permanent residents. It does not apply to noncitizens like [Petitioners] who never had lawful permanent resident status and therefore does not displace the ordinary meaning of 'seeking admission.'").

and indefinite article matters when determining statutory meaning." (citing Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys., 603 U.S. 799, 817 (2024))); see also Hernandez Alvarez, 175 F.4th at 1271 ("The second condition also lacks any definite article, such as 'the,' 'this,' or 'such,' which would indicate that the 'alien seeking admission' is necessarily the same alien who is an 'applicant for admission.'" (emphasis omitted)). Accordingly, the indefinite article "an" reveals that the "applicant for admission" and the non-citizen "seeking admission" refer to different things.

C

The INA's broader statutory scheme also supports the conclusion that § 1225(b) governs noncitizens arriving to the United States whereas § 1226 governs those already within our borders.

The type of noncitizen covered by each statute is reflected in their titles, headings, and general subject matter.[17]

---

[17] Although titles and headings cannot contravene statutory text, see Bhd. of R. R. Trainmen v. Baltimore & O. R. Co., 331 U.S. 519, 528-29 (1947), they may aid our interpretation, see Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc., 554 U.S. 33, 47 (2008) ("[S]tatutory titles and section headings 'are tools available for the resolution of a doubt about the meaning of a statute.'" (quoting Porter v. Nussle, 534 U.S. 516, 528 (2002))); see also Santillan Quiroz, 180 F.4th at 1239 ("While a title does not control over the text, it can helpfully 'reinforce[ ] what the text's nouns and verbs independently suggest.'" (citation omitted)); Guerrero Orellana, ---F.4th---, 2026 WL 2352042, at *14 n.24 (same).

Section 1225 is entitled "Inspection by immigration officers; expedited removal of inadmissible arriving aliens; referral for hearing," and accordingly uses terms focusing on individuals at the border. See 8 U.S.C. § 1225(b)(1) ("Inspection of aliens arriving in the United States and certain other aliens who have not been admitted or paroled."). Moreover, § 1225(b)(2) mentions categories of people typically understood to "arrive" at a border, such as "crewm[e]n" and "stowaways." § 1225(b)(2)(B); see also Hernandez Alvarez, 175 F.4th at 1278 ("[Section] 1225 seems to us to have been designed by Congress to govern arriving [noncitizens]. It lays out the procedures . . . for officers to inspect arriving vessels and people, couching its scope in the language of 'arriving aliens,' 'alien[s] seeking admission,' and [noncitizens] seeking 'transit through the United States.'"); Santillan Quiroz, 180 F.4th at 1239-40 (same).[18] Section 1226, on the other hand, is entitled "Apprehension and detention of aliens," and does not mention noncitizens arriving in the United States. 8 U.S.C. § 1226; see also Hernandez Alvarez, 175 F.4th at 1278 ("[Section] 1226 set[s] out a general rule of detention for [noncitizens] . . . who are suspected of being unlawfully in the interior . . . ."); Barbosa da Cunha, 175 F.4th at 73 (same).[19] The Supreme

---

[18] Section 1225(b)(2)(C) also reflects that § 1225 applies to individuals at the border because it discusses the return of individuals "arriving from a foreign territory contiguous to the United States" pending removal proceedings.

[19] The INA's regulations recognize this dichotomy by providing that "any arriving alien who appears to the inspecting officer to be inadmissible, and who is placed in removal proceedings pursuant to section 240 of the Act shall be detained in accordance with [§ 1225(b)] of the Act." 8 C.F.R. § 235.3(c)(1). The Notices to Appear here do not

Court recognized this distinction in describing § 1225(b) as "authoriz[ing] the Government to detain certain aliens seeking admission into the country," and § 1226 as "authoriz[ing] the Government to detain certain aliens already in the country pending the outcome of removal proceedings."[20] Jennings v.

---

classify either Petitioner as an "arriving alien," but rather identify each of them as an "alien present in the United States who has not been admitted or paroled." App. 46, 77. Thus, the Government's own documents suggest Petitioners' detentions under § 1225(b)(2)(A) are inconsistent with regulations interpreting the INA. See, e.g., Martinez v. Hyde, 792 F. Supp. 3d 211, 218-19 (D. Mass. 2025).

[20] Although Jennings made this observation in dicta, its insight is persuasive. See Off. Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery, 330 F.3d 548, 561 (3d Cir. 2003) (en banc) ("Although . . . the Supreme Court's dicta are not binding on us, we do not view it lightly."). Indeed, we have previously recognized that "we should not idly ignore considered statements the Supreme Court makes in dicta. The Supreme Court uses dicta to help control and influence the many issues it cannot decide because of its limited docket." In re McDonald, 205 F.3d 606, 612 (3d Cir. 2000); see also Barbosa da Cunha, 175 F.4th at 85 ("[W]e afford great deference to the Court's description of the statutory scheme in Jennings."); Hernandez Alvarez, 175 F.4th at 1279 ("The Court's interpretation of the INA [in Jennings] was not a passing, off-hand remark—it was an expansive and detailed account of how the statute is best read. We are obliged to afford Jennings some weight in how to view the provisions at issue today."); Guerrero Orellana, ---F.4th---, 2026 WL 2352042, at *14 (same); Santillan Quiroz, 180 F.4th at 1237 n.5 (same); Lopez-Campos, 175 F.4th at 721 (relying on

Rodriguez, 583 U.S. 281, 289 (2018) (plurality).[21]

For this additional reason, requiring mandatory detention for those arriving in the United States under § 1225(b)(2)(A) but permitting discretionary release for those already within our borders under § 1226(a) is wholly consistent with the statutory framework.[22] Barbosa da Cunha, 175 F.4th

---

Jennings to explain "the relationship between" §§ 1225 and 1226); Cirrus Rojas, ---F.4th---, 2026 WL 2198315, at *15 (same); Rodriguez Vazquez, ---F.4th---, 2026 WL 2196424, at *7 (same).

[21] This treatment is also consistent with a longstanding "distinction," for constitutional and other purposes, "between those aliens who have come to our shores seeking admission . . . and those who are within the United States after an entry, irrespective of its legality." Leng May Ma v. Barber, 357 U.S. 185, 187 (1958); Zadvydas v. Davis, 533 U.S. 678, 693 (2001) ("It is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders."); see also Barbosa da Cunha, 175 F.4th at 85 ("[I]t has long been settled that a noncitizen can effect an entry even by crossing the border illegally.").

[22] Giving those individuals a chance to seek bond makes sense because they may have community ties that make it more likely they will appear for future proceedings. See In Re Guerra, 24 I. & N. Dec. 37, 40 (BIA 2006) (recognizing that immigration judges in setting bond may consider, among other things, "(1) whether the alien has a fixed address in the United States; (2) the alien's length of residence in the United States; [and] (3) the alien's family ties in the United States"); see also Barbosa da Cunha, 175 F.4th at 78 ("[T]he strong rationale for

at 85 ("[T]he framework set forth in Jennings makes good sense in light of Congress's overall approach to immigration detention."); Hernandez Alvarez, 175 F.4th at 1279 ("The Government's interpretation cannot readily be reconciled with Jennings."); Guerrero Orellana, ---F.4th---, 2026 WL 2352042, at *14 (same); Rodriguez Vazquez, ---F.4th---, 2026 WL 2196424, at *12; Santillan Quiroz, 180 F.4th at 1237 (same).

D

Contrary to the Government's view, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") retained two tracks for detention even though it overhauled the procedures for removing noncitizens from the United States. Before IIRIRA, noncitizens arriving in the United States were subject to "exclusion" and those already in the country were subject to "deportation"—the former were held in mandatory detention while the latter were afforded bond. 8 U.S.C. §§ 1225, 1252 (1995); see also Landon v. Plasencia, 459 U.S. 21, 25 (1982) ("The deportation hearing is the usual means of proceeding against an alien already physically in the United States, and the exclusion hearing is the usual means of proceeding against an alien outside the United States seeking admission."). Under this regime, those who entered the United States surreptitiously were given more rights during deportation proceedings. For example, noncitizens subject to exclusion were not entitled to advance notice of the charges and bore the burden of proof, whereas noncitizens in deportation proceedings did not bear the burden

---

detaining noncitizens who are both 'applicants for admission' and 'seeking admission' does not apply to noncitizens who are one but not the other." (emphasis omitted)).

of proof and received notice of the charges as well as direct appellate review. See Landon, 459 U.S. at 25-27; Ortega-Lopez v. Barr, 978 F.3d 680, 682 (9th Cir. 2020) (acknowledging that before IIRIRA, "[t]he [G]overnment had the burden of proof at a deportation hearing, while the [noncitizen] had the burden of proof at an exclusion hearing"); see also Barbosa da Cunha, 175 F.4th at 89 n.9 (observing immigration laws formerly "granted substantial legal privileges and rights only to noncitizens in deportation proceedings, including rights to notice and direct appeal"); Cirrus Rojas, ---F.4th---, 2026 WL 2198315, at *13 (same); Rodriguez Vazquez, ---F.4th---, 2026 WL 2196424, at *4 (same); Hernandez Alvarez, 175 F.4th at 1282 (same).

To eliminate the more favorable treatment afforded to those in deportation proceedings, Congress passed IIRIRA, which, among other things, required that "applicant[s] for admission"—both those arriving to the country and those already within our borders—receive the same procedural and substantive rights in administrative proceedings.[23] See Martinez v. Att'y Gen., 693 F.3d 408, 413 n.5 (3d Cir. 2012); 8 U.S.C. § 1229a(c)(2)(A); 8 C.F.R. § 1240.8; see also Barbosa da Cunha, 175 F.4th at 89 n.9 ("One aim of IIRIRA was to eliminate the dual track for removal that had previously placed some noncitizens into exclusion proceedings and others into deportation proceedings."); Lopez-Campos, 175 F.4th at 731 (same); Rodriguez Vazquez, ---F.4th---, 2026 WL 2196424, at *4 (same); Hernandez Alvarez, 175 F.4th at 1282 (same). Although IIRIRA equalized some aspects of removal

---

[23] See also Al Otro Lado, 146 S. Ct. at 2114-15 (Sotomayor, J., dissenting) (explaining impact of the IIRIRA on removal proceedings).

proceedings for arriving noncitizens and those already present in the country, nothing in the Act suggests that Congress sought to eliminate the distinction between mandatory and discretionary detentions.[24] See Hernandez Alvarez, 175 F.4th

---

[24] The Government asks us to rely on IIRIRA's legislative history, specifically language from a House of Representatives Judiciary Committee report stating that IIRIRA was "intended to replace certain aspects of the current 'entry doctrine,' under which illegal aliens who have entered the United States without inspection gain equities and privileges in immigration proceedings that are not available to aliens who present themselves for inspection at a port of entry." H.R. Rep. No. 104-469, pt. 1, at 225 (1996) ("House Report"). We decline to do so.

First, resorting to legislative history is unnecessary here given the statute's plain text. See Mohamad v. Palestinian Auth., 566 U.S. 449, 458 (2012) ("[R]eliance on legislative history is unnecessary in light of the statute's unambiguous language." (citation omitted)); In re Phila. Newspapers, LLC, 599 F.3d 298, 304 (3d Cir. 2010), as amended (May 7, 2010) ("Where the statutory language is unambiguous, the court should not consider statutory purpose or legislative history."); see also Barbosa da Cunha, 175 F.4th at 88 ("[T]he [G]overnment's argument about the legislative history is irrelevant because the plain statutory text controls.").

Second, even if we considered legislative history, the language the Government relies upon merely provides that IIRIRA was "intended to replace certain aspects" of the then-existing regime that afforded those who entered without inspection "equities and privileges in immigration proceedings" unavailable to others. House Report at 225. This refers to the procedural and substantive changes to, among

other things, notice and burdens of proof in administrative proceedings. See Barbosa da Cunha, 175 F.4th at 89 ("[T]he [G]overnment erroneously concludes that IIRIRA sought to abolish all distinctions between arriving and already present noncitizens. It did not. Rather, IIRIRA had the much more modest goal of altering 'certain aspects of the [then] current "entry doctrine."' (emphasis omitted) (quoting House Report at 225)); Hernandez Alvarez, 175 F.4th at 1282 ("Congress was exceedingly clear about which parts of the entry doctrine it meant to target: namely, the discordant distinction between deportation proceedings and exclusion proceedings."). Indeed, the same House Report explains that "[§] 236(a) [, codified at § 1226(a),] restates the current provisions . . . regarding the authority of the Attorney General to arrest, detain, and release on bond an alien who is not lawfully in the United States." House Report at 229. Thus, the House Report shows Congress did not intend to overhaul the INA's discretionary detention regime as it pertained to noncitizens already present in the United States. See Barbosa da Cunha, 175 F.4th at 89 (recognizing the same); Guerrero Orellana, ---F.4th---, 2026 WL 2352042, at *16 (same); Rodriguez Vazquez, ---F.4th---, 2026 WL 2196424, at *22 (same); Santillan Quiroz, 180 F.4th at 1248-49 (same). To the extent the Government argues this interpretation encourages unlawful entry into the United States, this concern "cannot defeat the best reading of the text." Al Otro Lado, 146 S. Ct. at 2095.

Finally, comparing the statutory language before and after IIRIRA demonstrates the detention provisions remain largely intact. Compare § 1225(b) (1995) ("Every alien . . . who may not appear to the examining immigration officer at the port of arrival to be clearly and beyond a doubt entitled to land shall be detained for further inquiry to be conducted by a

at 1283 ("[T]he record is replete with evidence that Congress intended for § 1225 to continue governing procedures for arriving aliens, laying out how aliens arriving in or traveling through the country are inspected, detained, and removed on an expedited basis."); Barbosa da Cunha, 175 F.4th at 89 ("[T]he [G]overnment erroneously concludes that IIRIRA sought to abolish all distinctions between arriving and already present noncitizens. It did not."); Santillan Quiroz, 180 F.4th

---

special inquiry officer."), and § 1252(a) (1995) ("Pending a determination of deportability in the case of any alien . . . any such alien taken into custody may, in the discretion of the Attorney General and pending such final determination of deportability, (A) be continued in custody; or (B) be released under bond . . . ."), with § 1225(b)(2)(A) ("[I]n the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title."), and § 1226(a) (providing that "an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States" and the Attorney General "may release" him on bond); see also Rodriguez Vazquez, ---F.4th---, 2026 WL 2196424, at *18-19 (observing similarity of pre- and post-IIRIRA provisions). In its IIRIRA amendments, Congress moved "port of arrival" from the detention provision of § 1225 to § 1225(a), which now includes in its definition of "applicant for admission" those "who arrive[] in the United States (whether or not at a designated port of arrival . . . ." The omission of the phrase "port of arrival" in one portion of the statute and its incorporation in another does not suggest that IIRIRA upended § 1225's applicability to arriving noncitizens.

at 1248 ("While the Government's account is plausible, and many may agree with it as a matter of policy, it finds little purchase as an interpretive aid."); Guerrero Orellana, ---F.4th---, 2026 WL 2352042, at *16 (same); Lopez-Campos, 175 F.4th at 731 (same); Cirrus Rojas, ---F.4th---, 2026 WL 2198315, at *13 (same); Rodriguez Vazquez, ---F.4th---, 2026 WL 2196424, at *22-24 (same). Although our holding affords bond to those who entered our borders without authorization while mandating detention for noncitizens who present themselves, Congress established this distinction in IIRIRA, and if it meant to change it or influence the Government's interpretation of the statute in the years since its passage,[25] it

[25] In fact, when IIRIRA was passed, the Department of Justice explicitly recognized that noncitizens present in the United States were entitled to discretionary release, see Detention and Removal of Aliens, 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997) ("Despite being applicants for admission, aliens who are present without having been admitted or paroled (formerly referred to as aliens who entered without inspection) will be eligible for bond and bond redetermination."), and every administration since has done the same, see Loper Bright, 603 U.S. at 386 ("The longstanding practice of the government—like any other interpretive aid—can inform a court's determination of what the law is."); see also Barbosa da Cunha, 175 F.4th at 91 ("[T]here can be no debate that the Department of Justice's contemporaneous understanding of the statute was the same as Petitioner's."); Santillan Quiroz, 180 F.4th at 1248 (same). "[T]he fact that no President has ever found such power in [a longstanding statute] is strong evidence that it does not exist." Learning Res., Inc. v. Trump, 146 S. Ct. 628, 643 (2026); see also Hernandez Alvarez, 175 F.4th at 1283-84 ("[T]hat five presidential administrations over three

would have done so. See Zemel v. Rusk, 381 U.S. 1, 11 (1965) ("Under some circumstances, Congress['s] failure to repeal or revise in the face of such administrative interpretation has been held to constitute persuasive evidence that that interpretation is the one intended by Congress."); see also Hernandez Alvarez, 175 F.4th at 1284 ("Where Congress revisits a law but leaves a 'longstanding administrative construction . . . untouched,' the lack of corrective action suggests Congress agreed with the construction in place." (alteration in original) (quoting Saxbe v. Bustos, 419 U.S. 65, 74 (1974))); Guerrero Orellana, ---F.4th---, 2026 WL 2352042, at *17 (same); Rodriguez Vazquez, ---F.4th---, 2026 WL 2196424, at *26 (same). It did not.[26]

---

decades have read IIRIRA to distinguish between arriving and present aliens is 'powerful evidence' that the reading 'is natural and reasonable.'" (footnote and citation omitted)); Lopez-Campos, 175 F.4th at 725 (same); Cirrus Rojas, ---F.4th---, 2026 WL 2198315, at *15 (same); Rodriguez Vazquez, ---F.4th---, 2026 WL 2196424, at *25 (same); Santillan Quiroz, 180 F.4th at 1236 (same).

[26] Our interpretation that § 1225 was not intended to result in the mandatory detention of millions of noncitizens is also consistent with Congress's recognition when passing IIRIRA that the Immigration and Naturalization Service ("INS") would need to increase its detention capacity to accommodate the mandatory detention of certain criminal noncitizens under § 1226(c) and other provisions. See IIRIRA §§ 303(a), 110 Stat. at 3009-585. Specifically, Congress required INS to add at least 500 beds to its detention facilities, IIRIRA § 386(a), 110 Stat. at 3009-653 (requiring increase to "at least 9,000 beds before the end of fiscal year 1997); House Report at 123 (noting INS intended to have 8,500 beds by

E

The Government's interpretation of the relationship

---

1996), and paused implementation of parts of IIRIRA for two years until it could accommodate this increase in detention. See IIRIRA § 303(b), 110 Stat. at 3009-586.

Given the limited number of beds Congress mandated to accommodate the increased number of criminal noncitizens subject to removal without corresponding increases for non-criminal noncitizens, we are skeptical IIRIRA also mandated detention of, by Congress's count, millions of other noncitizens who had entered the country without admission. See Chisom v. Roemer, 501 U.S. 380, 396 (1991) ("[I]f Congress had such an intent, Congress would have made it explicit in the statute, or at least some of the Members would have identified or mentioned it at some point . . . ."); see also Barbosa da Cunha, 175 F.4th at 99 (Cabranes, J., concurring) ("Congress gave the Attorney General two years during which certain aliens could be released while five hundred beds were added. Notably, Congress allowed no such grace period for the mandatory detention of the two million aliens that Respondent says then came within § 1225(b)(2)'s sweep. That discrepancy is inexplicable." (footnotes omitted)); Cirrus Rojas, ---F.4th---, 2026 WL 2198315, at *14 ("[W]here Congress did expand the INA's mandatory-detention provisions, it did so carefully. . . . That Congress did not enact a similar provision [expanding detention capacity] for Section 1225(b)(2)(A)—which would have mandated detention for at least two million people in 1996—is telling."); Guerrero Orellana, ---F.4th---, 2026 WL 2352042, at *16-17 (same); Lopez-Campos, 175 F.4th at 731 (same); Rodriguez Vazquez, ---F.4th---, 2026 WL 2196424, at *23 (same); Hernandez Alvarez, 175 F.4th at 1283 (same).

between §§ 1225(b)(2)(A) and 1226 is incorrect for two additional reasons. First, the Government's view significantly limits § 1226(a)'s scope such that almost all noncitizens present without authorization would no longer be entitled to bond. By the Government's telling, § 1226 "is the exclusive source of detention authority for the substantial category of aliens who . . . were admitted but are now deportable." Appellants' Br. at 48. In other words, the Government contends that § 1226(a) is meant for the detention of noncitizens in the United States who were previously admitted, such as those who overstayed their visas. The statute's text is not so narrow as to only apply to those noncitizens. See Hernandez Alvarez, 175 F.4th at 1278 ("While the Government claims that § 1226(a) applies only to aliens who were first admitted, nothing in the provision itself supports this reading."); Barbosa da Cunha, 175 F.4th at 73 ("[T]he government's position is untenable based on the plain text of the statute, which obviously does not limit its application to that narrower category of noncitizens."); Guerrero Orellana, ---F.4th---, 2026 WL 2352042, at *5 (same) (observing the Government offers "no direct authority for this assertion").

Second, it renders unnecessary recent amendments to § 1226. In early 2025, Congress passed the Laken Riley Act, which expanded § 1226 to require mandatory detention of "inadmissible" noncitizens involved in certain criminal conduct in the United States. See Pub. L. No. 119-1, 139 Stat. 3 (2025) (codified at § 1226(c)(1)(E)). "Congress is presumed to enact legislation with knowledge of the law and a newly-enacted statute is presumed to be harmonious with existing law and judicial concepts[,]" Mack v. Yost, 63 F.4th 211, 222 (3d Cir. 2023) (citation omitted), so if Congress intended for all noncitizens present without authorization to be detained under

§ 1225, it would not have added mandatory detention for only certain criminal noncitizens within our borders.[27] See Hernandez Alvarez, 175 F.4th at 1279 ("[W]hy would the Laken Riley Act target unadmitted aliens who were otherwise already included within the ambit of § 1225(b)(2)(A) by later adding a new and separate provision?"); Guerrero Orellana, ---F.4th---, 2026 WL 2352042, at *14 (same); Barbosa da Cunha, 175 F.4th at 87-88 (same); Rodriguez Vazquez, ---F.4th---, 2026 WL 2196424, at *20 (same); Santillan Quiroz, 180 F.4th at 1247 (same); see also Cirrus Rojas, ---F.4th---, 2026 WL 2198315, at *15 ("Congressional failure to intervene and correct the Executive's prior interpretation—despite passing the Laken Riley Act last year—'is persuasive evidence that the interpretation is the one intended.'" (citation

[27] The Government insists that § 1226(c) complements the statutory scheme by preventing the parole of criminal noncitizens detained under § 1225(b)(2)(A) who could otherwise be released for "humanitarian reasons or significant public benefit." § 1182(d)(5)(A). This misreads § 1226(c), which "is simply a limit on the authority conferred by subsection [§ 1226](a)." Nielsen v. Preap, 586 U.S. 392, 409 (2019). Indeed, nothing in any statute suggests that Congress intended § 1226(c) to govern parole, which is addressed in an entirely different portion of the INA. See Hernandez Alvarez, 175 F.4th at 1280 ("If Congress meant to limit the Attorney General's authority [using § 1226(c) in amending parole provisions relating to § 1225], it could well have done so in either § 1225(b)(2) or § 1182(d)(5)—not in an ancillary provision that says nothing about either part of the statute."); Santillan Quiroz, 180 F.4th at 1247 (same).

omitted)).[28] Put plainly, the Government's reading results in "a serious statutory redundancy." Hernandez Alvarez, 175 F.4th at 1280. If one were to read § 1225(b)(2)(A) as mandating detention of unadmitted noncitizens within our borders, then § 1226(c) would be almost wholly unnecessary. See Rodriguez Vazquez, ---F.4th---, 2026 WL 2196424, at *20 ("[T]he redundancy in § 1226(c) introduced by the government's interpretation creates an additional cloud over the government's account of the statutory text."); Barbosa da Cunha, 175 F.4th at 87-88 (same); Cirrus Rojas, ---F.4th---, 2026 WL 2198315, at *12 (same); Santillan Quiroz, 180 F.4th at 1247 (same). By amending § 1226(c), Congress reiterated that bond is unavailable to some unadmitted noncitizens within the country. At the same time, § 1225(b)(2)(A) continues to mandate detention for noncitizens at the border. See Hernandez Alvarez, 175 F.4th at 1280-81. Because § 1225(b)(2)(A) does not apply to Petitioners as they were not detained at the border, their detentions were unlawful under that provision of the INA.

[28] The Government argues that the time between 1996 and 2025 means inconsistencies between §§ 1225 and 1226 following the Laken Riley Act are not meaningful guides to our interpretation. This argument overlooks that Congress enacts new law with the knowledge of existing law. Mack, 63 F.4th at 222. Thus, we decline to conclude that Congress was unfamiliar with the law it was amending merely due to the passage of time. See Barbosa da Cunha, 175 F.4th at 88 (recognizing surplusage "canon applies . . . even though the Laken Riley Act was enacted later in time").

III

We also conclude that Petitioner's detention without bond hearings violates the Due Process Clause.

The Supreme Court has recognized the Fifth Amendment's "Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." Zadvydas v. Davis, 533 U.S. 678, 693 (2001); Mathews v. Diaz, 426 U.S. 67, 77 (1976) ("Even one whose presence in this country is unlawful, involuntary, or transitory is entitled to [the due process of law]."); Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 212 (1953) ("[Noncitizens] who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law."); see also Barbosa da Cunha, 175 F.4th at 94 ("Petitioner is protected by the Fifth Amendment's Due Process Clause . . . ."); Santillan Quiroz, 180 F.4th at 1250 ("[T]he Supreme Court has never said that due process protections fall away completely in the immigration context. Quite the opposite."); Lopez-Campos, 175 F.4th at 732 (same); Cirrus Rojas, ---F.4th---, 2026 WL 2198315, at *16 (same).

The Government relies on Department of Homeland Security v. Thuraissigiam, 591 U.S. 103 (2020) to argue that Petitioners are only entitled to due process as afforded by statute. Their reliance on Thuraissigiam is misplaced as that case concerned the "entry fiction" doctrine as applied to a noncitizen apprehended within twenty-five yards of the border, i.e. "at the threshold of initial entry." Id. at 107. The Court determined that the noncitizen should be treated as if he never

entered the country such that he "cannot claim any greater rights under the Due Process Clause" than those provided by statute. Id. However, the Court also recognized that other noncitizens "who have established connections in this country have due process rights in deportation proceedings." Id. Because Petitioners here have lived in the United States for decades, they have "established connections" in the country and are entitled to due process rights beyond those provided to noncitizens at the border. See Barbosa da Cunha, 175 F.4th at 86 ("While the [entry fiction] doctrine may extend further than the twenty-five yards and twenty-four hours at issue in [Thuraissigiam], no one could seriously contend that it applies to a noncitizen like Petitioner who has been living in the United States for decades." (citation omitted)); Rodriguez v. Ortega, 180 F.4th 702, 709 (5th Cir. 2026), reh'g en banc granted, opinion vacated, 26-50183, 2026 WL 2014647 (5th Cir. July 10, 2026). ("The Government is trying to equate that to the entry of hundreds of miles and years of residence. Such supposed equivalence is far more than a convenient legal fiction. It is a complete fantasy."); Lopez-Campos, 175 F.4th at 733-34 ("Thuraissigiam merely reinforces our longstanding understanding that noncitizens 'on the threshold of initial entry stand[ ] on a different footing' than those who have 'passed through our gates.' It does not control where, like in the instant case, noncitizens have resided within the United States for years." (alteration in original) (citation omitted)); Cirrus Rojas, ---F.4th---, 2026 WL 2198315, at *16 n.7 (same).

Thus, we must determine whether detention without bond of noncitizens who have lived in the United States for extended periods of time with no criminal records violates due process. See Morrissey v. Brewer, 408 U.S. 471, 481 (1972) ("Once it is determined that due process applies, the question

remains what process is due."). To assess Petitioners' due process claim, we consider: (1) "the private interest that will be affected by the official action," (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards," and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." Mathews v. Eldridge, 424 U.S. 319, 335 (1976); see also Rodriguez, 180 F.4th at 725 (applying Mathews to assess "'the process that is constitutionally due' before aliens may be deprived of their liberty interests" (citation omitted)). As explained herein, these factors show that Petitioners have been deprived of due process.

First, mandatory detention implicates Petitioners' "constitutionally protected interest in avoiding physical restraint." Kansas v. Hendricks, 521 U.S. 346, 356 (1997); Zadvydas, 533 U.S. at 690 ("Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects."); Hamdi v. Rumsfeld, 542 U.S. 507, 529 (2004) (recognizing "the interest in being free from physical detention by one's own government" as "the most elemental of liberty interests"); see also Rodriguez, 180 F.4th at 725 (acknowledging similarly situated petitioners had "a cognizable interest in being free from unjustified physical restraint").

Second, the absence of an opportunity for a neutral decisionmaker to assess whether Petitioners are dangerous, see United States v. Salerno, 481 U.S. 739, 748 (1987) ("[W]e have found no absolute constitutional barrier to detention of

potentially dangerous resident [noncitizens] pending deportation proceedings."), or flight risks, see Bell v. Wolfish, 441 U.S. 520, 534 (1979) (acknowledging that pre-trial detainees may be held to ensure they appear for trial), presents a high risk of erroneously depriving Petitioners of their liberty interest. See Rodriguez, 180 F.4th at 720 n.8 ("Dangerousness and flight risk have long been viewed as justifications for detention in immigration proceedings." (citing Leng May Ma v. Barber, 357 U.S. 185, 190 (1958) ("Physical detention of aliens . . . is generally employed only as to security risks or those likely to abscond."))).[29]

---

[29] The Government contends that dangerousness and flight risk should not be considered because these facts are not relevant to § 1225, and principally relies on Connecticut Department of Public Safety v. Doe, 538 U.S. 1, 8 (2003) ("Plaintiffs who assert a right to a hearing under the Due Process Clause must show that the facts they seek to establish in that hearing are relevant under the statutory scheme.") for their argument. Doe is inapposite because it did not disturb the Supreme Court's caselaw on confinement but rather concerned a plaintiff's reputational interest when he was required to register as a sex offender following a criminal conviction, where the facts concerning his conduct were fully aired. Id. at 4, 6. Given that Doe presented a situation where the party's dangerousness was already considered and due process protection concerned reputation rather than liberty, it does not apply in a situation like this one, where no evidence on either flight or danger was adduced before their liberty was infringed. See Foucha v. Louisiana, 504 U.S. 71, 86 (1992) (requiring state to establish dangerousness in cases of civil confinement); see also Rodriguez v. Ortega, 180 F.4th 702, 716-17 (5th Cir.

Third, the Government's legitimate interest in preventing the release of dangerous noncitizens and those who might fail to appear at future hearings, Zadvydas, 533 U.S. at 690, does not outweigh the other two factors here, particularly when these non-criminal individuals were detained absent evidence that either is dangerous or a flight risk, and the Government has not argued that bond hearings are unduly burdensome. See Rodriguez, 180 F.4th at 725 ("[A]s long-time residents of this country with children who are citizens, there is no evidence that [petitioners] are a flight risk . . . . They have no criminal background or history of violence and appear to have each peaceably lived in this country, obedient to its laws, for over a decade.").

Thus, the Mathews factors weigh in Petitioners' favor, and their detentions without bond hearings violated their procedural due process rights.[30]

IV

For the foregoing reasons, we will affirm.

---

2026), reh'g en banc granted, opinion vacated, 26-50183, 2026 WL 2014647 (5th Cir. July 10, 2026).

[30] Because Petitioners prevail on their procedural due process claims, we need not also address their substantive due process arguments to the extent they were fully presented on appeal.

MASCOTT, *Circuit Judge*, dissenting.

The majority opinion holds that although aliens approaching the United States at an authorized border entry point may be held without bond, aliens slipping undetected past the border may not. I respectfully dissent.

## I

Under the terms of the Immigration and Nationality Act (INA) and its 1996 amendments (IIRIRA),[1] all aliens "seeking admission" as applicants for United States admission are subject to mandatory detention without bond while their lawful presence claims are adjudicated.[2] According to the majority, people approaching the border at an authorized location are "seeking admission" because of their open and intentional request for entry and lawful admission.[3] But, on its account, aliens who crossed the border undetected by authorities until years later are not "seeking admission" within the statute's terms despite their desire to remain in the United States.[4] Under the majority's view, such individuals were not actively trying to gain legal status here at the time of their detention.[5] Rather, they were content to stay here illegally until they were discovered. Therefore, those individuals are not technically "seeking" admission and fall outside the INA's mandatory detention provisions for admission applicants under the majority's semantic view.[6]

The majority's interpretation is inconsistent with both the text and structure of IIRIRA and with any ordinary, or

---

[1] *See* Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, 110 Stat. 3009-546 (1996).

[2] *See* 8 U.S.C. § 1225(b)(2)(A) ("[I]n the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title.").

[3] *See* Maj. Op. at 16.

[4] *See* 8 U.S.C. § 1225(b)(2)(A); Maj. Op. at 9–22.

[5] Maj. Op. at 13.

[6] *See* 8 U.S.C. § 1225(b)(2)(A); Maj. Op. at 9–22.

commonsense, understanding of the phrase "seeking admission."[7] It also would subject individuals who lawfully ask permission to enter the country to much tougher rules than people who submit formal requests to stay only once detained or inspected by immigration officials.[8]

This is not the system Congress enacted in its 1996 reforms to the immigration system.[9] The District Courts'

---

[7] *Cf. Jennings v. Rodriguez*, 583 U.S. 281, 293–94 (2018) (plurality opinion) ("eschew[ing] 'uncritical literalism'" in tension with text, context, and structure, "leading to results that 'no sensible person could have intended'" (quoting *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 319 (2016))); *see also FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 278 (2016) (adopting a "common-sense construction" of the Federal Power Act's language).

[8] Maj. Op. at 23.

[9] *See Buenrostro-Mendez v. Bondi*, 166 F.4th 494, 503 (5th Cir. 2026), *petition for cert. filed*, No. 26-43 (U.S. July 2, 2026); *Avila v. Bondi*, 170 F.4th 1128, 1134 (8th Cir. 2026) (holding that Petitioners detained for removal proceedings after crossing the border without inspection are subject to § 1225's mandatory detention provision); *see also Guerrero Orellana v. Moniz*, No. 25-2152, 2026 WL 2352042, at *17 (1st Cir. Aug. 13, 2026) (Dunlap, J., dissenting); *Lopez-Campos v. Raycraft*, 175 F.4th 713, 735 (6th Cir. 2026) (Murphy, J., dissenting), *petition for cert. filed*, No. 25-1415 (U.S. June 22, 2026); *Cirrus Rojas v. Olson*, No. 25-3127, ---F.4th---, 2026 WL 2198315, at *17 (7th Cir. July 30, 2026) (Sykes, J., dissenting); *Rodriguez Vazquez v. Bostock*, No. 25-6842, ---F.4th---, 2026 WL 2196424, at *26 (9th Cir. July 30, 2026) (Bea, J., dissenting); *Hernandez Alvarez v. Warden*, 175 F.4th 1258, 1285 (11th Cir. 2026) (Lagoa, J., dissenting). The Second and Tenth Circuits held the other way, along with split panels on the First, Sixth, Seventh, Ninth, and Eleventh Circuits. *See Barbosa da Cunha v. Freden*, 175 F.4th 61, 84 (2d Cir. 2026), *petition for cert. filed*, No. 26-104 (U.S. July 23, 2026); *Santillan Quiroz v. Mullin*, 180 F.4th 1226, 1250–51 (10th Cir. 2026); *Guerrero Orellana*, 2026 WL 2352042, at *3; *Lopez-Campos*, 175 F.4th at 722; *Cirrus Rojas*, 2026 WL 2198315, at *2; *Rodriguez Vazquez*, 2026 WL 2196424, at *3; *Hernandez Alvarez*, 175 F.4th at 1262; *cf. Rodriguez v. Ortega*,

decisions releasing Petitioners should be reversed. Congress broadly defined the class of "applicants for admission" in 1996 and generally required detention without bond while aliens' claims to entry are being evaluated.[10] That detention scheme, including Petitioners' detention here, is consistent with the constitutional due process principles articulated by the Supreme Court.[11] I would reverse both orders and remand.

## II

As the majority opinion details, both Petitioners initially crossed the United States border well more than a decade ago.[12] They entered without stopping at an authorized entry point and requesting inspection.[13] Petitioner Gabriel Antonio Buele Morocho was detained in fall 2025 by Immigration and Customs Enforcement officers who charged him with civil

---

180 F.4th 702,717 (5th Cir.), *reh'g en banc granted, opinion vacated*, 181 F.4th 608, 609 (5th Cir. 2026) (finding a due process problem with a previous panel's interpretation of the statute, even though that earlier panel had previously found such detentions were consistent with statutory authority and indeed mandated by it).

[10] *See* 8 U.S.C. § 1225(a)(1) ("An alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters) shall be deemed for purposes of this chapter an applicant for admission."); *see also* 8 C.F.R. § 235.3(b) (allowing expedited removal without any process or proceedings of certain arriving aliens, rather than allowing their release within the country); *id.* § 241.25(c) ("Any alien ordered excluded who boarded an aircraft or vessel in foreign contiguous territory or in any adjacent island shall be deported to such foreign contiguous territory or adjacent island if the alien is a native, citizen, subject, or national of such foreign contiguous territory or adjacent island, or if the alien has a residence in such foreign contiguous territory or adjacent island."); *infra* Part III for more interpretive discussion.

[11] *See infra* Part IV.

[12] *See* Appellant's Br. at 18; Appellees' Br. at 15.

[13] *See* Appellant's Br. at 18.

inadmissibility for presence without admission under 8 U.S.C. § 1182(a)(6)(A)(i).[14] Petitioner Wanderson Lopes de Andrade entered without inspection in 2014 and has lived in the United States since that time.[15] He was ordered removed in absentia in 2016 and briefly detained in 2019 before his release during the pandemic on an order of supervision.[16] Subsequently, he applied for asylum, an application that remains pending.[17]

Both men challenged the Government's statutory authority for their detention without bond under § 1225(b)(2). Mr. Buele Morocho was detained for 56 days.[18] Mr. Lopes de Andrade was detained for 24 days.[19] Mr. Lopes de Andrade also contended that his detention violated constitutional due process because it lacked a hearing on the questions of whether he posed a flight risk or danger to the community[20]—even though the Supreme Court previously held that individualized bond determinations were *not* constitutionally required for a class of aliens mandatorily detained under a separate provision of the INA.[21]

Both Petitioners contend that the Government was required to detain them instead under § 1226(a), a provision applicable generally to "aliens" that permits the Attorney General to release aliens from detention on bond during their inadmissibility or deportation hearings.[22] But in 1996, Congress enacted significant reforms to the immigration laws in IIRIRA, eliminating the INA's procedural distinctions based on whether an alien had crossed the border and instead

---

[14] *See id.*; J. App'x at 21; *see also* 8 U.S.C. § 1182(a)(7).
[15] J. App'x at 5–6.
[16] *Id.* at 6.
[17] *Id.*; *see also generally* 8 U.S.C. § 1158(a)(2) (excluding from asylum anyone whose application comes more than one year after their entry subject to exceptions just for material changed circumstances or "extraordinary" causes justifying delay). Individuals who fall outside the time bar without establishing qualification for one of the two exceptions are statutorily barred from asylum applications. *See* 8 U.S.C. § 1158(a)(2).
[18] *See* Appellant's Br. at 18–19 (from September 30, 2025, to November 24, 2025).
[19] *See id.* (from January 20, 2026, to February 12, 2026).
[20] *See* J. App'x at 15.
[21] *See Demore v. Kim*, 538 U.S. 510, 528 (2003).
[22] *See* 8 U.S.C. § 1226(a)(1)–(2).

distinguishing between deportability for previously admitted aliens and removal pre-admission. Previously, aliens who approached the border at an authorized entry point were subject to detention without bond, and aliens who entered unauthorized and were later detained were afforded bond proceedings.[23] The 1996 amendments eliminated those distinctions, placing all aliens who have not yet been admitted under the category of "applicants for admission."[24] And 8 U.S.C. § 1225(b)(2)(A) requires the detention of "applicants for admission" without bond under § 1229a.[25]

The District Courts agreed with Mr. Buele Morocho and Mr. Lopes de Andrade that they should have been detained under § 1226(a) rather than § 1225(b)(2)(A).[26] The courts released both Petitioners into the interior of the United States with no legal determination on their entitlement to remain in the United States.[27] Those decisions were wrong. I would reverse.

## III

Under well-trodden principles of statutory interpretation, the Government correctly concluded that Petitioners are aliens "seeking admission" to the United States, and therefore § 1225(b)(2)(A) authorizes their mandatory

---

[23] *See Buenrostro-Mendez,* 166 F.4th at 498–99 ("Before 1996, the detention provisions in the Immigration and Nationality Act (INA) distinguished between aliens who presented at a port of entry and those who evaded inspection. Aliens who arrived at a port of entry were subject to mandatory detention until the conclusion of the exclusion process and could not request release on bond. In contrast, aliens who evaded inspection and were apprehended months or years later could seek release on bond pending deportation proceedings." (citations omitted)).

[24] *See* 8 U.S.C. § 1225(a)(1) ("An alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters) shall be deemed for purposes of this chapter an applicant for admission.").

[25] *See id.* § 1225(b)(2)(A).

[26] *See* J. App'x at 16; *id.* at 25.

[27] *See id.*

detention for the duration of the Government's consideration of their claims of entitlement to remain in the United States.[28] In 1996, Congress and the President enacted reforms to the INA, bringing parity to detention treatment for all aliens who had not yet acquired lawful status in the United States and, consequently, are "applicants[s] for admission" to the country. Petitioners fall squarely within that group, under the text and structure of the INA and the 1996 amendments to it in IIRIRA.

But under IIRIRA, there is more than one scheme for evaluating an alien's lawful entitlement to presence in the United States. Separate provisions govern specific forms of relief, like grants of asylum or the withholding of removal.[29] But the two primary procedural schemes for evaluating a general right to be admitted or remain are in (1) § 1225(b)(2) working in tandem with § 1229a removal proceedings and (2) § 1226(a).[30]

The parties agree that § 1225(b)(2)(A) applies to standard applicants for admission who approach the border at an authorized entry point.[31] A second detention scheme in § 1226(a) applies to aliens who have been lawfully present in the United States but now face potential deportation for one

---

[28] *See* 8 U.S.C. § 1225(b)(2); *id.* § 1225(a)(1); *id.* § 1101(a)(13).

[29] *Id.* § 1158 (asylum); *id.* § 1231 (withholding of removal).

[30] *See id.* § 1225(b)(2); *id.* § 1226(a); *id.* § 1229a. Other provisions, like 8 U.S.C. § 1228, govern more specific circumstances, such as aliens subject to expedited removal proceedings for convictions of aggravated felonies. *See id.* § 1228(a). And § 1225(b)(1) authorizes development of an expedited removal scheme for aliens detained within their first two years of continuous presence in the country. *Id.* § 1225(b)(1)(A)(iii).

[31] *See* Appellant's Br. at 38; Appellees' Br. at 19; J. App'x at 13 (the District Court concluding that those "taking active steps to obtain entry into the United States" are detainable under this provision); *see also* 8 U.S.C. § 1225(a)(1) (including within applicants for admission an alien "who arrives in the United States (whether or not at a designated port of arrival[)]"); *id.* § 1225(b)(2)(A) (referring to "an applicant for admission" who is "seeking admission").

reason or another.[32] Petitioners and the Government disagree about whether § 1226(a)'s general reference to "aliens" means the Government must apply § 1226 to Petitioners or whether Petitioners who have not yet been admitted to the country but entered years ago are more appropriately subject to § 1225(b)(2)(A).

Section 1226(a) is preferable, in Petitioners' view, because it permits the Attorney General to release aliens on bond during the proceedings adjudicating their entitlement to remain in the country.[33] Section 1225(b)(2)(A), on the other hand, mandates detention without bond. Petitioners contend the Executive Branch lacked authority to hold them under § 1225(b)(2)(A) and should have continued applying § 1226(a) to aliens detained in the country's interior instead—even where those aliens had never acquired lawful admission status or lawful status of any kind. But they misperceive the statutory scheme. Section 1226(a) references "alien[s]" in general, potentially extending to Petitioners here. But § 1225(b)(2)(A) is more specific—it mandates detention under § 1229a for all "applicant[s] for admission" where an examining officer determines the alien "seeking admission" is "not clearly and beyond a doubt entitled to be admitted."[34]

**A**

The answer to Petitioners' dispute with the Government over their detention pursuant to § 1225(b)(2)(A) is readily apparent within the text of IIRIRA. In full, § 1225(b)(2)(A) provides:

> Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if

---

[32] *Id.* § 1226(a) (authorizing, generally, the Attorney General to arrest and detain "*an alien* . . . pending a decision on whether the alien is to be removed from the United States" without specifying anything specific about the alien's admission status (emphasis added)).

[33] *Id.* ("On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. . . . [T]he Attorney General—(2) may release the alien on—(A) bond . . . or (B) conditional parole . . . .").

[34] *Id.* § 1225(b)(2)(A).

> the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title.[35]

Petitioners contend that the Government may not hold them under § 1225(b)(2)(A) because they are not "seeking admission" under the statute.[36] Their aim is different, they say, from those who presented themselves at the border and followed the statutory procedures for admission. They did not want lawful admission then, and they claim they do not want it now. So on their hyper-technical reading of the statute, they cannot be "seeking admission," and the Government cannot apply to them the ordinary requirements that everyone forthrightly requesting admission at the border must follow.[37] In their view, after Petitioners' many years of not following the rules, they're entitled to a bond hearing, so they can seek release from detention while their claims are adjudicated[38]—even though similarly situated people, who instead first head to the United States border to ask for entry, are mandatorily detained while the Government sorts through their entry claims.[39]

---

[35] *Id.*

[36] *See* Appellees' Br. at 19 ("The statute applies only to those noncitizens who are seeking admission at the border: noncitizens who arrive at a port of entry or who arrive between those ports but have not yet effected an entry.").

[37] *See id.* at 33.

[38] *See id.* at 22–32.

[39] *See* 8 U.S.C. § 1225(b)(2); *see also Lopez-Campos*, 175 F.4th at 735 (Murphy, J., dissenting) ("Our country's immigration laws once encouraged illegal behavior. If immigrants lawfully stopped for an inspection at our border, the Immigration and Nationality Act (INA) required the government to detain them pending a hearing on their right to be here. But if immigrants unlawfully snuck across the border, they could get released on bond pending such a hearing. In 1996, Congress eliminated this discrepancy. It told courts that they must treat both arriving immigrants at the border and present immigrants who entered illegally as 'applicant[s] for admission' under the INA." (alteration in original)).

**B**

Grounded in the text and structure of the applicable statutory scheme, the Government correctly interprets IIRIRA to mandate Petitioners' evaluation under § 1225.[40] This puts Petitioners at parity with other applicants for admission—the subset of those who, in contrast to Petitioners, properly presented themselves at the border before entry. More importantly, the Government's interpretation is correct under the law and those mandated statutory procedures accord with Supreme Court precedent on the constitutional strictures of due process as further detailed below.

Under the statute's terms and the text of § 1225(b)(2)(A)'s mandatory detention instruction, the question turns on whether Petitioners fall within the class of "applicants for admission" covered by the text of that provision. The majority and Petitioners claim the otherwise broad provision is narrowed by the subsequent phrase "an alien seeking admission," creating essentially a subset of the applicant class to whom § 1225(b)(2)(A) exclusively applies.[41] This reading is inconsistent with IIRIRA's terms, the statutory structure, the relevant enactment history, and the use of the terms "seeking" and variants of "apply" and "applicant" elsewhere in the statutory scheme, as well as § 1225's own internal instructions for how its provisions are to be read and applied.

<u>§ 1225(a)</u>

Under IIRIRA, Congress broadly defined the category of "applicant for admission" at issue in this case. In a "deem[ing]" clause, Congress designated across the board several broad categories of aliens as such "applicants." In particular, § 1225(a)(1) provides: "An alien present in the United States [(i)] who has not been admitted or [(ii)] who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters) shall be deemed for purposes of this chapter an applicant for admission."[42]

---

[40] *See Johnson v. Guzman Chavez*, 594 U.S. 523, 542 (2021).
[41] Maj. Op. at 11.
[42] 8 U.S.C. § 1225(a)(1).

This provision plainly includes aliens not yet admitted[43]—i.e., those not yet granted legal status in the United States—as well as those who are just arriving. All aliens in those groups are "deemed" applicants for admission. And that "deeming" clause expressly has broad effect—the status of "applicant[] for admission" carries with the arriving or not-yet-admitted aliens all the way through "this chapter."[44] The chapter containing the deeming clause is Chapter 12 of Title 8 of the U.S. Code; it spans § 1101 through § 1537 of the INA, and includes provisions addressing admission qualifications, change of status, inspection, exclusion, removal, nationality and loss of nationality, numerous procedural requirements, and many others.[45]

Petitioners concede they are applicants under this deeming clause.[46] It would be nearly impossible for them to do otherwise. They do not claim to have ever been lawfully admitted to the United States. Just like the aliens desiring admission in the United States who present themselves transparently at the border, Petitioners are "present in the United States," they "ha[ve] not been admitted" previously, and therefore the statute "deem[s]" them "applicant[s] for admission" for purposes of all of Chapter 12, whatever that entails.[47]

---

[43] *See id.* § 1101(a)(13)(A) ("The terms 'admission' and 'admitted' mean, with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer.").

[44] *Id.* § 1225(a)(1).

[45] *See generally id.* §§ 1101–1537; *see also, e.g.*, *id.* §§ 1181–1189 (admission qualifications); *id.* §§ 1221–1232 (inspection, examination, exclusion, and removal); *id.* §§ 1401–1489 (national and loss of nationality); *id.* § 1521–1522 (refugees).

[46] *See Bond v. United States*, 572 U.S. 844, 871 (2014) (Scalia, J., concurring in the judgment) ("When a statute includes an explicit definition, we must follow that definition, *even if it varies from that term's ordinary meaning*." (quoting *Stenberg v. Carhart*, 530 U.S. 914, 942 (2000))).

[47] The majority does not significantly grapple with the implications and operative effect of § 1225(a)(1) extending its "applicant" designation throughout all of Chapter 12. Indeed, the majority essentially would abandon the applicant designation of Petitioners—or any alien not formally in a

The disagreement is principally over the next step.

Section 1225(a)(1) was enacted as part of the 1996 IIRIRA reforms. It was the tip of the spear for changing the bifurcation of the immigration scheme from entry versus exclusion to admission versus deportability. Prior to 1996, immigration status and relevant procedures attached significant distinctions to whether an alien had crossed the border and entered the country or whether the alien stood outside the country and was subject to exclusion.[48] Now, under current law, status turns on inadmissibility versus deportability. Inadmissibility, as § 1225(a)(1) defines its mirror image, "applicant for admission," is for aliens who have not yet acquired legal status. Deportability is applicable to individuals who had acquired legal status but might no longer have entitlement to remain lawfully present.[49]

Rather than distinguishing among classes of aliens and the procedures applicable to them based on geographic location and where the alien stands in relation to the border, like the majority and Petitioners' test, the 1996 statutory reforms shifted to evaluation of whether an alien had previously acquired lawful presence or admission status.[50] As the Supreme Court noted in *Department of Homeland Security*

---

present application process—any further than just the bounds of § 1225(a)(1) itself. Maj. Op. at 9–22. For what purpose have Petitioners been deemed "applicants for admission" if not to fall within applicant instructions and requirements contained within § 1225 itself? Immediately following § 1225(a), in § 1225(b)(2)(A), Congress addressed "applicant[s] for admission" and the mandatory-detention-without-bond scheme before the court today. *See* 8 U.S.C. § 1225(b)(2)(A).

[48] *See Buenrostro-Mendez*, 166 F.4th at 498–99.

[49] *See, e.g.*, 8 U.S.C. § 1229a(a)(1) ("An immigration judge shall conduct proceedings for deciding the inadmissibility or deportability of an alien."); *id.* § 1229a(a)(2) ("An alien placed in proceedings under this section may be charged with any applicable ground of inadmissibility under section 1182(a) of this title or any applicable ground of deportability under section 1227(a) of this title."); *see also generally id.* § 1227 (establishing criteria making aliens "deportable" that include losing admissibility or becoming "inadmissible" at the time of their entry or adjustment of status).

[50] *See Buenrostro-Mendez*, 166 F.4th at 498–99.

*(DHS) v. Thuraissigiam*, under the statutory scheme even an "alien who tries to enter the country illegally" is nonetheless "treated as an 'applicant for admission.'"[51] Congress did not want there to be a "perverse incentive to enter at an unlawful rather than a lawful location."[52]

In addition to this enactment backdrop, at least three features of the text of this "deem[ing]" language are particularly pertinent to further unpack the question here. First, "deemed" is a legal command essentially creating a legal status of "applicant for admission" that applies to a broad class. Congress did not direct courts to ask, on a case-by-case basis, whether an alien colloquially has put forward an application for admission. It assigned a legal status to all present in the United States who had not yet acquired legal admission and directed that "applicant for admission" assignment hold "for purposes of this chapter," Chapter 12.[53] The provision creates a status; it does not invite an inquiry into one.[54] And Congress's broad assignment of the designation throughout the entirety of Chapter 12 extends to § 1225(b)(2) governing adjudication of Petitioners' claims.[55]

Second, the deeming clause contains no temporal limitation. The phrase "present in the United States" is unqualified. It is unbounded by length of presence, proximity to the border, or active steps to obtain status. An alien who

---

[51] 591 U.S. 103, 140 (2020).

[52] *See id.*

[53] *See* 8 U.S.C. § 1225(a)(1).

[54] *Sturgeon v. Frost*, 587 U.S. 28, 47 (2019) (defining "deemed" as a drafting device used "to establish a legal fiction"); *id.* (warning that the deeming clause cannot be read so as to deprive it of its "point" or to turn the provision into "an inkblot").

[55] *Cf. Buenrostro-Mendez*, 166 F.4th at 502–08; *Avila*, 170 F.4th at 1133–38; *see also Hernandez Alvarez*, 175 F.4th at 1287–89 (Lagoa, J., dissenting) (noting that § 1225(a)(1)'s use of "deemed" creates a legal fiction that carries the ordinary attributes of the assigned status, so that one deemed an applicant for admission is treated as seeking admission); *Lopez-Campos*, 175 F.4th at 740–41 (Murphy, J., dissenting) (arguing that Congress's direction to treat an unadmitted alien as an applicant for admission "for purposes of" the INA operates by law, making that alien one "seeking admission").

entered without inspection in 2001 is, consequently, as a matter of statutory definition, no less an applicant for admission today than an alien who entered last week.

Third, § 1225(a)(1) broadly extends its definition, throughout Chapter 12 of the INA spanning from 8 U.S.C. § 1101 through § 1537 and of course including within it § 1225(b)(2)(A). The Court must give the term "applicant for admission" the same meaning in (b)(2)(A) that the statute supplies in (a)(1), throughout all of § 1101 through § 1537, spanning the entirety of Chapter 12. Section 1225(a)(1) supplies an explicit definition of "applicant for admission," and that definition governs wherever the defined term appears in the Chapter.[56]

The majority's analysis acknowledges (a)(1) but gives the first prong surprisingly little work to do in the detention provision that immediately follows.[57] On its reading, the universe of aliens "present in the United States who ha[ve] not been admitted" are deemed applicants for admission by Congress's express command in (a)(1).[58] Yet that broad categorical depth carries no weight and is of no consequence. Under Petitioners' and the majority's interpretation, one's status as "applicant for admission" does not even carry over to subsequent subsections within 8 U.S.C. § 1225, the section creating the category. Although Congress deems a broad group legally to be "applicant[s] for admission" in § 1225(a)(1) for purposes of the whole chapter, by the next subsection, § 1225(b), the majority's read is that the statute's reference to the class "applicant for admission" sets aside no independently significant group.[59] For instance, § 1225(b)(2), in the majority's view, applies only to those actively pursuing formal requests for legal admission, not to the class of "applicant[s]" designated earlier at the start of the statutory section in § 1225(a)(1)—even though § 1225(b)(2) begins by referring to that admission "applicant" group.[60] Under that reading, the

---

[56] *See Stenberg*, 530 U.S. at 942 ("When a statute includes an explicit definition, we must follow that definition, even if it varies from that term's ordinary meaning.").
[57] Maj. Op. at 9–10.
[58] *Id.*
[59] *Id.* at 12–22.
[60] *See* 8 U.S.C. § 1225(b)(2)(A) ("Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for

first prong of (a)(1) becomes a label without consequence inside the very statute it introduces. That is difficult to reconcile with the breadth of the text Congress chose, and it is in tension with the Supreme Court's instruction that a deeming clause must have a "point."[61]

Further, under the majority's reading, the § 1225(b) reference to "applicant[s] for admission" ultimately is surplusage.[62] They read the statute to require only a separate group, those actively "seeking admission," to be placed in mandatory detention. But then the § 1225(b)(2)(A) reference to the § 1225(a)(1) applicant class is meaningless and unnecessary. The only aliens seeking admission would be those who "ha[ve] not yet been admitted." So why reference the §1225(a)(1) applicant class at all, if "seeking admission" simply designates an entirely different group or even subset of (a)(1)? Section 1225(b)(2)(A) could merely have begun, "[I]f the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title." There are no terms in § 1225(b)(2)(A) that require anything of "applicants for admission" separate from the group of aliens "seeking admission." Moreover, the subsection ends with a reference to "the alien" using a definite article, with two provisions containing the term "alien" preceding it—"an alien who is an applicant for admission" and "an alien seeking admission." The singular definite reference to "the alien" in the final clause suggests the earlier two "alien" groups are one and the same for purposes of § 1225(b)(2)(A).

Further, directly contrary to the majority's suggestion that the group "seeking admission" is significantly narrow than the "applicant" group, those "seeking admission" in Chapter 12 include . . . None of those groups are "applicant[s] for

---

admission, if the examining immigration officer determines that an alien seeking admission . . . .").

[61] *Sturgeon*, 587 U.S. at 61 ("There is no reason to pretend that inholdings are not part of a park if they can still be regulated as parklands."). The same logic applies here: There is no reason to deem an alien an applicant for admission if the deeming carries no consequence in the very chapter "for purposes of" which the deeming operates.

[62] Maj. Op. at 13.

admission. This suggests those "seeking admission" throughout the INA may actually be a larger group than the "applicant[s]"—flipping the majority view of 1225(b)(2)(A) on its head.

"Applicant for Admission"

The specific uses of the "applicant" phrase throughout Chapter 12 underscore its breadth and demonstrate that the term includes aliens like Petitioners who are not actively, formally applying for admission.[63] There are nine instances of the term "applicant for admission" in Chapter 12, and they are highly informative.[64] Four usages are in § 1225(a).[65] Other than § 1225(a)(1) that establishes the category, § 1225(a)(2) removes stowaways entirely from the eligible class of aliens who can be "applicant[s] for admission," underscoring the INA's general disfavoring of deceit and rule-breaking in the admission process.[66] Section 1225(a)(2) is one of a number of penal provisions for individuals who circumvent the admission and immigration system.[67] This statutory system disfavoring those who break the rules, declining to give them new process

[63] See *Weyerhauser Co. v. U.S. Fish & Wildlife Servs.*, 586 U.S. 9, 20 (2018) ("[W]e consider the context of the surrounding terms and other provisions within the statutory scheme."). The statute itself here instructs the reader to examine context by expressly specifying that the "applicant for admission" status set forth in § 1225(a)(1) extends throughout Chapter 12 of the INA. *See* 8 U.S.C. § 1225(a)(1).

[64] *See* 8 U.S.C. §§ 1105(b)(1), 1182(d)(5)(A), 1187(h)(3)(E), 1225(a)(1), 1225(a)(2), 1225(a)(3), 1225(a)(5), 1225(b)(2)(A), 1229a(c)(2)(A).

[65] *See id.* § 1225(a)(1), (2), (3), (5). Subsection 1225(a)(3) is addressed in the discussion on the use of the term "or otherwise seeking admission."

[66] *See id.* § 1225(a)(2) ("In no case may a stowaway be considered an applicant for admission or eligible for a hearing under section 1229a of this title.").

[67] *See id.*; *see also, e.g.*, *id.* § 1182(a)(6)(C)(i) (designating inadmissible any alien who tries to procure a visa "or admission" through "fraud" or the "willful[] misrepresent[ation] [of] a material fact"); *id.* § 1182(a)(6)(C)(ii) (designating inadmissible any alien who falsely represented himself to be a U.S. citizen).

and benefits, is highly unlikely to contain the discrimination in favor of illegal entrants that the majority opinion and Petitioners would have us read into the statute.

Section 1225(a)(5) is more directly informative. There, the provision applies to "[a]n applicant for admission." It then uses a definite article, "the," to reference that initial subject. Section 1225(a)(5) provides that the "applicant" may have to state under oath information regarding the "intentions of *the* applicant in *seeking admission*."[68] Here, with an even tighter nexus than in § 1225(b)(2)(A), Congress used the phrase "seeking admission" simply to describe the state of an applicant.[69] It creates no new subset. *An applicant for admission* is *the applicant* seeking admission. Applicants "seek[]" admission, and they might need to provide relevant information under oath. Aliens "seeking admission" are not a separate subset standing apart from a broader applicant class.

Other informative instances of the term in Chapter 12 include § 1105(b)(1). There, Congress addresses national crime files. The section provides instructions for "determining whether or not a visa applicant or applicant for admission" has a criminal history index—suggesting that the two classes and possible statuses of individuals desiring U.S. presence are visa applicants or admission applicants.[70] There is no third class of individuals in the crime index who still want to remain in the United States but somehow do not "seek[]" admission simply because they tried to circumvent formal application procedures.

Then in § 1182(d)(5)(A) dealing with the allocation of parole, Congress's language is directly inconsistent with Petitioners' assertion that aliens not actively applying for

---

[68] *Id.* § 1225(a)(5) (emphases added).

[69] *See id.* (referencing "the purposes and intentions of the applicant in seeking admission").

[70] *Id.* § 1105(b)(1) (describing the "purpose of determining whether or not a visa applicant or applicant for admission has a criminal history record indexed in any such file"). One additional usage of "applicant for admission" arises in 8 U.S.C. § 1187(h)(3)(E) which addresses reporting requirements under the visa waiver program, which authorizes temporary visits up to 90 days, so the provision is not immediately informative here.

admission are outside the class "seeking admission."[71] The Attorney General has power to temporarily parole "any alien applying for admission."[72] But even after parole ends, the alien is to be treated just like "any other applicant for admission to the United States."[73] This suggests there is a particular way to "deal[]" with such applicants. Individuals remain such applicants whether they are active or inactive in "applying," just like aliens who had been granted parole whose status has since ended.[74]

The dual, just-two-class division of immigration statuses also is evident from § 1229a(c)(2) where Congress established relevant burdens of proof.[75] Again using a definite article, "the," Congress provided two choices—if "the alien" is "an applicant for admission," the alien has the burden to establish he is "clearly and beyond doubt entitled to be admitted."[76] Otherwise, he must show "by clear and convincing evidence" that "the alien is lawfully present in the United States pursuant to a prior admission."[77] There is no third way. Aliens are either in the "applicant" class with the attendant burden of proof or they have a prior admission. This burden structure also matches up with § 1225(b)(2)(A) itself, which uses the "clearly and beyond a doubt" standard to refer to "an alien seeking admission."[78] There are two burden standards in § 1229a removal proceedings—those for "aliens seeking admission" (i.e., all applicants) or those who have "prior admission[s]."[79]

Pre-Admission Detention and Release

There is no INA category permitting aliens, before they have established *any* legal entitlement to *any* form of U.S. presence, to remain in the country and roam free. Section 1225 addresses release prior to admission, and it is very specific and

---

[71] *Id.* § 1182(d)(5)(A).
[72] *Id.*
[73] *Id.*
[74] *See id.*
[75] *Id.* § 1229a(c)(2)(A).
[76] *See id.*
[77] *Id.* § 1229a(c)(2)(B).
[78] *Id.* § 1225(b)(2)(A).
[79] *Id.* § 1229a(c).

particular about the circumstances in which this is permitted.[80] Under § 1225(b)(2)(C), where an applicant for admission "arriv[es] on land" from "a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a [§ 1229a] proceeding."[81] Even here, the release is not into the United States. Rather, the alien is sent back across the border to the country out of which he is trying to pass to remain there while waiting for his determination.

It defies commonsense and logic to conclude that within this finely grained, reticulated statutory scheme, Congress *sub silentio*, authorized all applicants not actively and formally requesting admission prior to detention to be released on bond right into the United States interior. What would be the point, then, of the § 1225(b)(2)(C) particularized treatment for contiguous territories? If aliens can be released into the United States on bond while waiting for their admissibility determination, there is no need to return aliens to a contiguous territory for them to remain outside detention.

<u>§ 1225(b)(1)–(2)</u>

Moving on to the operative provision underlying this case, § 1225(b)(2)(A)'s structure further informs the singular nature of the "applicant for admission" class. Congress may modify a word within one statutory provision, but doing so simply specifies an application of that term; it does not change

---

[80] Even where aliens are raising a claim to the very protected and sacrosanct status of asylum due to persecution, § 1225 has detailed mandates about the process to which they are subject, keeping applicants under watchful supervision and detention according to § 1225(b)(1)(B)(ii). For example, if an "alien indicates either any intention to apply for asylum . . . or a fear of persecution, [an] officer shall refer the alien for an interview by an asylum officer." *Id.* § 1225(b)(1)(A)(ii). Asylum interviews are to take place "either at a port of entry or at such other place designated by the Attorney General." *Id.* § 1225(b)(1)(B)(i). And even where the officer "determines . . . that an alien has a credible fear of persecution . . . , the alien *shall be detained* for further consideration of the application for asylum." *Id.* (emphasis added).

[81] *Id.* § 1225(b)(2)(C).

its meaning.[82] Contrary to the majority opinion's implicit qualifying additions to the § 1225(b)(2)(A) description of applicants, the group "seeking admission" is the same group as the "admission" applicants described in the very same provision. There are not two distinct admission groups.

Reading § 1225(b)(2)(A) as a complete whole, the phrase addressing admission with the modification of "seeking" refers to the group of admission applicants who are the provision's primary subject. The provision addresses the "case of an *alien* who is an applicant for *admission*"; where "the examining immigration officer determines that an *alien* seeking *admission*" is not entitled to be admitted, the alien shall be detained under § 1229a.[83] Further, the provision's use of a definite article, "the," suggests the alien referenced throughout the statute is one and the same.[84] After referring to "an alien who is *an* applicant for admission" and "*an* alien seeking admission," the statute commands "*the* alien shall be detained."[85]

<u>"seeking"</u>

The majority opinion's reading of § 1225(b)(2)(A) also is inconsistent with the ordinary meaning of the term "seeking admission" and the structure of how the phrase "seeking admission" fits within the § 1225(b)(2)(A) detention

---

[82] *See Perrin v. United States*, 444 U.S. 37, 42, 49–50 (1979).

[83] 8 U.S.C. § 1225(b)(2)(A) (emphases added); *see also* 18 U.S.C. § 3583(e)(1) (permitting a court to "terminate a term of supervised release" and discharge a defendant after "one year" of that same term of "supervised release" if certain conditions exist).

[84] *See Nielsen v. Preap*, 586 U.S. 392, 408 (2019) ("'[T]he' is a function word indicating that a following noun or noun equivalent is definite or has been previously specified by context." (alterations, internal quotation marks, and citation omitted)); *id.* ("Congress's 'use of the definite article in a reference to 'the appraisement' means an appraisement specifically provided for." (alterations omitted) (quoting *Work v. United States ex rel. McAlester-Edwards Co.*, 262 U.S. 200, 208 (1923))).

[85] *See* 8 U.S.C. § 1225(b)(2)(A) (emphases added).

instructions.[86] The majority opinion and Petitioners contend that the present participle "seeking" in the § 1225(b)(2)(A) provision limits its reach to only those aliens who are actively, formally "seeking" a determination of admission.[87] Those efforts must be ongoing, in Petitioners' view, for the mandatory-detention-without-bond provision to apply. The majority opinion compares this use of the term "seeking" to one "seeking" admission in a movie theater, meaning one must be actively requesting entry.[88]

This limitation is in tension with the structure and mechanics of the statutory provision. For example, immediately following the § 1225(b)(2)(A) reference to express textual limitations in subparagraphs (B) and (C), § 1225(b)(2)(A) identifies its objects—"an alien who is an applicant for admission." Further, the meat of the provision begins with, "in the case of" such aliens (i.e., "in the case of an alien who is an applicant for admission"), conveying the circumstances in which the statute applies. The whole point of the provision is to tell the reader what process to apply to those aliens who are applicants.[89]

The provision, further, does not condition § 1229a detention on an alien-by-alien inquiry into each alien's intentions. The deeming clause of (a)(1) assigns the status of "applicant" by operation of statute whether or not the alien at the precise moment of detention is taking affirmative, formal steps to lawfully enter or lawfully acquire U.S. presence.[90] So long as an alien is in the United States without admission, he is

---

[86] *See, e.g.*, *EPA v. Calumet Shreveport Refin., L.L.C.*, 145 S.Ct. 1735, 1757 (2025) (instructing that interpreters are to give a word its "ordinary meaning" under standard statutory interpretation principles); *Bostock v. Clayton County*, 140 S.Ct. 1731, 1738 (2020) ("[O]ur duty is to determine the ordinary public meaning of the provision at issue.").
[87] Maj. Op. at 12–13.
[88] *Id.* at 20.
[89] *See* 8 U.S.C. § 1225(b)(2)(A) ("Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title.").
[90] *See id.*

"seeking" that status. He must be. There is no other, third category other than applicants subject to the procedural requirements for (i) aliens who have not yet achieved lawful presence and (ii) aliens who were admitted in the past. Where an alien desires presence in the United States, he is "seeking" admission under the ordinary, common-sense meaning of the term. Neither the statutory structure nor its text nor general principles of language require an alien to take a step not specified in the statute to remain in a state of "seeking" admission while he is in the hunt for U.S. presence.

The provision then goes on to describe the case in which the applicants must be detained under § 1229a—when "the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted."[91] The limiting descriptor there is "clearly and beyond a doubt." But the reference to "examining immigration officer" assumes there will be such an officer anytime there is an applicant—§ 1225(b)(2)(A) refers to "the" officer, not "if an . . . officer determines."[92] Further, when discussing the relevant process, the statutory provision references some form of the term "admit" three times—without any indication the admission relates to distinct groups or subsets.[93] The statutory provision also gives no particular definition or description to the term "alien" that would subject the provision's three references to "alien" identify distinct groups.[94]

Dictionary definitions of the terms "applying" and "seeking," further, show the terms have a permissibly broad application and meaning, ranging beyond a one-time, active request. For example, the *American Heritage Dictionary* defines "seek" as "[t]o endeavor to obtain or reach" such as "seek[ing] a college education"—an action or state of mind that could extend throughout a child's entire grade-school and

---

[91] *See id.*

[92] *Id.* (emphasis added).

[93] *See id.* § 1225(b)(2)(A) (e.g., "an alien . . . applicant for admission"; "an alien seeking admission"; "if . . . not clearly and beyond a doubt entitled to be admitted, the alien . . .").

[94] *See id.* ("in the case of an alien who is an applicant for admission," "an alien seeking admission," and "the alien shall be detained . . . .").

secondary education.[95] Other definitions of the term in that dictionary include "[t]o go to or toward"—again, movement and action that can extend over a period of time. *Merriam-Webster* similarly defines "seek" and "seeking" broadly, as "to resort to: go to" or "to go in search of"—the kinds of phrases that in no way connote one limited particular point in time but rather appear to describe a process or state of being.[96] *Webster Collegiate* also defines the term as "to try to acquire or gain" or "to ask for: request," which is closer to Petitioners' view but ultimately could be satisfied here by Petitioners' present, ongoing desire to remain here in the United States.[97] The 1989 version of the *Oxford English Dictionary*'s definition of "admission" is likewise telling—defining the term as "[t]he action of admitting to some position, standing, or privileges, distinguished from . . . the literal action of letting in to a place."[98] This definition is consistent with the conception of an application for admission or a "seeking" of admission as embodying a state of being rather than a formal, affirmative time-limited act of formally requesting permission.

<u>"or otherwise"</u>

The majority opinion and Petitioners also contend that the phrase "or otherwise" in § 1225(a)(3) of the statute supports their view and keeps Petitioners outside of the § 1225(b)(2)(A) mandate.[99] This position, too, stands the statute on its head and is unnatural. Under § 1225(a)(3), "[a]ll aliens (including alien crewmen) who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers."[100] They say "or otherwise" sets aside a

---

[95] *seek*, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE, https://ahdictionary.com/word/search.html?q=seek (last visited August 27, 2026).
[96] *seek*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/seek (last visited August 27, 2026).
[97] *Id.*
[98] *admission*, OXFORD ENGLISH DICTIONARY (2d ed. 1989).
[99] Maj. Op. at 18–19.
[100] 8 U.S.C. § 1225(a)(3).

subcategory here of "applicants for admission" and shows that not all applicants "seek[]" admission.

But the opposite is true—the "otherwise" class is broader here. First, the initial reference of "[a]ll aliens . . . who are applicants for admission" is comprehensive. Second, just a straightforward cross-reference to other provisions within Chapter 12 of the INA, such as provisions covering nonimmigrant visas, provides information about the larger group of "applicants for admission" who "otherwise" "seek[] admission." For example, § 1187(h)(3)(E) gives instructions for collecting information from such nonimmigrant applicants who desire visas for temporary presence rather than long-term status.[101]

More, it is a familiar principle of statutory interpretation that the phrase "or otherwise" typically stands for the first in a list.[102] It signifies the following phrase such as "seeking admission" is a catchall—making the reference broader, not narrower, than the group of "applicant[s] for admission."[103]

Further, under §§ 1225(a)(1) and 1225(a)(3), aliens who enter lawfully enter at a "port of entry." Aliens who are "caught trying to enter at some other spot" also are "treated the same way" and fall under the same definition of applicant for

---

[101] *Id.* § 1187(h)(3)(E) (mandating that the "Secretary of Homeland Security shall collect from an *applicant for admission* pursuant to this section information on any additional or previous countries of citizenship of that applicant" and take that into account "when making determinations as to the eligibility of the alien for admission pursuant to this section," which addresses the visa waiver program (emphasis added)).

[102] *Cf. Begay v. United States*, 553 U.S. 137, 153 (2008) (Scalia, J., concurring) (observing that the phrase "or otherwise" is a "catchall").

[103] *See, e.g.*, *Villarreal v. R.J. Reynolds Tobacco Co.*, 839 F.3d 958, 963–64 (11th Cir. 2016) (en banc) ("or otherwise" introduces a first category that is a subsection of the second); *Kieber v. CareFusion Corp.*, 914 F.3d 480, 483 (7th Cir. 2019) (the terms preceding "or otherwise" are "meant to be subsumed by what comes after the 'or otherwise' clause"); *see also Buenrostro-Mendez*, 166 F.4th at 503–04 (finding that "the phrase 'or otherwise' suggests that 'applicants for admission' are a subset of those 'seeking admission'").

admission.[104] Aliens who sneak past are not formally seeking lawful entry—whether they are caught within a few minutes of passing the border or a few years. If one needs to be actively affirmatively seeking legal status to be under the terms of aliens who are "applicants for admission . . . seeking admission" in § 1225(b)(2)(A), then illegal border crossers caught within miles and minutes of the border would not qualify either. Yet the Supreme Court has already referred to such individuals as admission applicants.[105]

**C**

In addition to the interpretive information evident from the provisions directly addressing the § 1225 detention mandate, the surrounding statutory structure supports the Government's use of § 1225(b)(2) detention authority for Petitioners.[106] Statutory definitions within 8 U.S.C. § 1101 governing the INA and the structure of textual exemptions from the § 1225(b)(2)(A) detention mandate indicate that "applicants for admission" include more than those formally pursuing an admission application process at the time they are detained.

§ 1101 Definitions

Section 1101 of the INA provides textual definitions for dozens of terms throughout the statute. A number of those definitions are informative here and arguably dispositive. Notably, the term "seeking" is not one of those that is defined.[107]

Take, for example, 8 U.S.C. § 1101(a)(13)(C), which treats a lawful permanent resident (LPR) returning from abroad as "seeking an admission into the United States" in six enumerated circumstances: abandonment or relinquishment of lawful permanent resident status; continuous absence exceeding 180 days; engagement in illegal activity after departure; departure during pending removal proceedings;

---

[104] *See Thuraissigiam*, 591 U.S. at 108.
[105] *See id.* (describing lawful entry to be at a port of entry but noting that aliens who were caught and not trying to lawfully enter are also admission applicants).
[106] *Cf. City and County of San Francisco, CA v. EPA*, 604 U.S. 334, 339 (2025) (examining the "text and structure" of an Act to examine the scope of an agency's authority under it).
[107] 8 U.S.C. § 1101(a)(1) –(52), (b)–(i).

commission of an offense identified in § 1182(a)(2); or an attempt to enter at a place other than a designated port of entry.[108] Under § 1101(a)(13)(C), LPRs in those sets of circumstances can be regarded as "seeking an admission." Yet a number of those six conditions are passive and do not suggest the alien is actively engaged in a formal admission application process, as the majority's position requires for the "seeking" of admission. Rather, LPRs who essentially lost legal status by engaging in crime out of the country or by attempting unlawful departure or by having an extended absence are eligible to be considered "seeking admission."[109] This section shows that "seeking" admission is not necessarily tied to actively pursuing an ongoing formal admission application process. Instead, it is more about one's legal status and whether one needs to acquire admission, or entitlement to lawful status, in the United States.

The § 1101(a)(13)(C) population is significant for the present case because these aliens were lawfully admitted. They do not fit § 1225(a)(1)'s deeming clause, which captures the never-admitted. Yet Congress nonetheless treats them as "seeking an admission" and subjects them to § 1225 inspection.

That treatment cannot be reconciled with the majority's reading of "seeking admission." If the phrase requires present, active conduct directed at lawful entry, then a lawful permanent resident returning home after a 181-day absence is not actively "seeking." He is returning to a residence he lawfully holds. Congress treats him as seeking admission anyway. The phrase functions as a statutorily assigned posture, not as a description of present-tense activity.

In even more tension with the majority opinion, exclusion of aliens detained in the interior would orphan the § 1101(a)(13)(C) population from § 1225 entirely. Returning LPRs were admitted; they are therefore not "deemed

---

[108] *Vartelas v. Holder*, 566 U.S. 257, 262–63 (2012). Section 1101(a)(13)(C) was added by IIRIRA. It replaced the prior "entry" doctrine, under which a returning lawful permanent resident with substantial ties to the United States was generally not regarded as seeking a new admission. *See Rosenberg v. Fleuti*, 374 U.S. 449, 461–62 (1963).

[109] *See* 8 U.S.C. § 1101(a)(13)(C).

applicants" under (a)(1).[110] On the majority's view, they also would not be "seeking admission," so it is unclear what vehicle or admission status they would use to retain or regain LPR status or admission to the country. This reading inverts the statutory architecture.

Section 1101(a)(13)(A) reinforces the result. Although the Act provides no definition for the term "seeking" or to "seek," it defines "admission" and "admitted." The Act's definition and color on these terms essentially broadens their application rather than narrowing the § 1225(a)(1) category of "applicant for admission."

The Act defines "admission" and "admitted" with respect to an alien simply as "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer."[111] When it describes "applicant for admission," the Act not only clarifies that the phrase refers to application for general admission to the United States—not "application for the issuance of an immigrant or nonimmigrant visa."[112] The Act also instructs that "*any* alien present in the United States who has not been admitted" should be deemed an "applicant for admission."[113] This is without respect to when an individual initially arrived in the United States, or whether he arrived at a designated port for lawful processing.[114] The statutory deeming provision explicitly makes clear, by its terms, that arriving aliens are only one subcategory of those that are to be deemed "applicants."[115]

<u>Exemptions, § 1225(b)(1)-(2)</u>

The exemptions within §1225(b) confirm this meaning. The textual structure of the detention mandate itself, within

---

[110] *Id.* § 1225(a)(1) ("deem[ing]" as "applicants for admission" only those who have not previously "been admitted").
[111] *Id.* § 1101(a)(13)(A).
[112] *Id.* § 1101(a)(4).
[113] *Id.* § 1225(a)(1) (emphasis added).
[114] *See id.* (referring to aliens who arrive "(whether or not at a designated port of arrival . . .)").
[115] *See id.* § 1225(a)(1) ("An alien present in the United States who has not been admitted *or who arrives in the United States* . . . shall be deemed for purposes of this chapter an applicant for admission." (emphasis added)).

§ 1225(b)(2), shows its reach beyond just applicants formally seeking lawful approval prior to detention. The § 1225(b)(1) expedited removal program applicable to aliens in the United States for less than two years likewise confirms that § 1225(b)(2)(A) authority extends beyond aliens formally requesting lawful presence.

Further, the § 1225(b)(1) expedited removal authority provides another clear, high-profile example of an Executive Branch policy determination not to use the full range of its removal or detention authority for decades after a statute's enactment. Similar to the nonapplication of § 1225(b)(2)(A) detention-without-bond authority from 1996 through 2026, the Attorney General, until 2019, chose to apply expedited removal only to a subset of aliens present for less than two years and found close to the border.[116] For example, when exercising expedited removal authority in 2004, the Executive Branch applied those procedures only to aliens detained within 100 miles of the border who had been continuously present in the United States for less than 14 days.[117] DHS explained that it was "not logistically possible" at the time "for DHS to initiate removal proceedings against all" of the "nearly 1 million aliens who [were] apprehended each year in close proximity to the borders after illegal entry."[118] So as a practical matter, DHS announced it would focus even its new exercise of authority on a subset of aliens such as third-country nationals and Canadian and Mexican nationals with criminal histories.[119]

Executive use of the full scope of expedited removal authority was nonetheless judicially upheld when DHS announced in 2019 that aliens within the statutory reach of expedited removal authority would be potentially subject to those procedures moving forward.[120] This announcement was

---

[116] *See* Designating Aliens for Expedited Removal, 84 Fed. Reg. 35,409, 35,413 (July 23, 2019). Designating Aliens for Expedited Removal, 69 Fed. Reg. 48,877, 48,878–79 (August 11, 2004).

[117] *See* Designating Aliens for Expedited Removal, 69 Fed. Reg. 48,877 (Aug. 11, 2004).

[118] *See id.* at 48,878.

[119] *See id.*

[120] *See Make the Rd. N.Y. v. Mullin*, 179 F.4th 16, 20 (D.C. Cir. 2026).

issued nearly twenty years after the Executive Branch first concluded it had the statutory authority to take this step.[121]

Within the same 1997 announcement implementing the 1996 IIRIRA enactment that provided a fulsome interpretation of expedited removal authority, the Executive Branch interpreted all aliens present without admission to be "applicants for admission" despite choosing to voluntarily give them eligibility for bond hearings.[122] Immigration authorities also provided by regulation in 1997 that aliens within the two-year expedited removal timeframe "shall be detained" under § 1225(b)(2)(A) if the Executive Branch desired to pursue inadmissibility charges against them other than those provided for within the expedited removal framework.[123] Executive Branch authorities have repeatedly noted the difficulty of providing process to the sheer number of aliens arriving at the border, which has driven a number of its decisions about how fulsomely to use the discretion Congress has provided in removal authority under immigration statutes.[124]

---

[121] *See* Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10,312, 10,355 (Mar. 6, 1997) (finding that the Commissioner of the Immigration and Naturalization Service, who oversaw immigration procedures at that time, had the "sole discretion" to apply expedited removal procedures to aliens who entered the United States without admission status and remained present "continuously for the 2-year period immediately prior to the date of determination of inadmissibility"). *Contra Rodriguez-Vazquez*, 2026 WL 2196424, at *2–3 (9th Cir. 2026) (starting the court's opinion interpreting mandatory detention authority with the fact that it was not used fulsomely until 2026 and suggesting that has significant interpretive weight).

[122] *See* 62 Fed. Reg. at 10,323; *see also Buenrostro-Mendez*, 166 F.4th at 506.

[123] *See* 8 C.F.R. §§ 235.3(b)(1)(ii), (b)(3) (providing that aliens within the two-year expedited removal timeline against whom the Executive Branch desires to pursue inadmissibility charges other than those within the expedited removal framework "shall be detained" under § 1225(b)(2)(A); *see also* 62 Fed. Reg. at 10,355–56; *Buenrostro-Mendez*, 166 F.4th at 307.

[124] *See, e.g.*, 69 Fed. Reg. at 48,878 (noting that "DHS has a pressing need to improve the security and safety of the nation's

The trajectory of the use of expedited removal authority is not dissimilar from the Executive Branch's 2020 determination to apply, for the first time, Title 42 authority to aliens arriving at the border during the COVID-19 pandemic. At that time, the Administration expelled aliens arriving at and even crossing over the border without either expedited removal or § 1229a hearings. To do so, the Executive Branch applied public health provisions first enacted in 1944 that had previously remained little-used.[125] Courts upheld the use of this authority under two separate presidential administrations extending from 2020 all the way through May 2023. Its previous disuse did not prevent judicial affirmance of Executive Branch implementation of the statutory authority when needed as a policy matter. And in any event, the Supreme Court has observed previously that sometimes the scope of authority permitted within statutory terms differs from, or is broader than, longstanding agency practice.[126]

Beyond this history of Executive Branch practice, the structure and exceptions within § 1225(b)(2)(A) themselves show the designation "applicant for admission" is not coextensive with just the collection of aliens formally requesting a lawful determination. And the systemic exception from the standard §§ 1225(b)(2)(A) and 1229a admission determinations and detention scheme contained within § 1225(b)(1), colloquially designated "expedited removal," structurally and textually also confirms this reading.

### § 1225(b)(1)—Expedited Removal

Section 1225(b)(2)(A) provides that it "shall not apply to any alien to whom paragraph (1) applies."[127] Section 1225(b)(1) in turn includes within it provisions authorizing immediate removal of pre-admission aliens continuously

---

land borders" but "lacks the resources" to detain all apprehended aliens who "subsequently fail to appear for their removal proceedings" after being "released in the U.S. each year").

[125] *See* 42 U.S.C. § 265; 58 Stat. 704 (1944).

[126] *See, e.g.*, *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483–84 (1999) (discussing discretionary provisions within the INA).

[127] 8 U.S.C. § 1225(b)(2)(A).

present in the United States for under two years.[128] The Supreme Court in *Thuraissigiam* found application of expedited removal to be consistent with due process, concluding that with aliens who have just crossed the border into the United States any liberty interests that have attached are satisfied by the statutory procedures Congress has chosen to give them.[129]

But beyond this history, the terms of § 1225(b)(1) indicate that the touchstone for defining "applicant for admission" in § 1225(b)(2)(A) is not "arriving" at the border. All aliens arriving at the border and crossing unlawfully, for up to two years, are detainable and immediately removable under § 1225(b)(1) if the Attorney General chooses to use that authority. These aliens clearly include within their group many who were not formally, lawfully requesting or proactively "seeking" legal permission to remain in the United States. Yet they are subject to § 1225(b)(1) and would be subject to § 1225(b)(2)(A) but for its terms excepting § 1225(b)(1) from its reach.[130]

This alternative to detention within the United States while section § 1229a removal proceedings are ongoing is highly informative for two reasons. First, it again demonstrates that Congress was giving highly specific and detailed instructions parsed out by subgroups within § 1225(b)(2), making far-fetched the idea that Congress would carve out

---

[128] *See id.* § 1225(b)(1)(A)(i) ("If an immigration officer determines that an alien who is arriving in the United States or is described in clause (iii) is inadmissible under section 1182(a)(6)(C) or 1182(a)(7) of this title, the officer shall order the alien removed from the United States without further hearing or review . . . ."); *id.* § 1225(b)(1)(A)(iii)(I) ("The Attorney General may apply clauses (i) and (ii) of this subparagraph to any or all aliens described in subclause (II) as designated by the Attorney General."); *id.* § 1225(b)(1)(A)(iii)(II) ("An alien described in this clause . . . has not affirmatively shown . . . that the alien has been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility under this paragraph.").

[129] *See Thuraissigiam*, 591 U.S. at 138–39.

[130] 8 U.S.C. § 1225(b)(2)(B) ("Subparagraph (A) shall not apply to an alien . . . (ii) to whom paragraph (1) applies.").

some undefined group of non-"seeking" applicants in contrast to the ordinary meaning of "to seek." It strains credulity to posit that Congress would exempt crewman, stowaways, aliens eligible for expedited removal, and aliens arriving (i) by land (ii) from contiguous territories but not spell out a fifth legal category of those not actively "seeking" admission. Moreover, as the Supreme Court has noted, "[a]n exception to a 'general statement of policy' is 'usually read narrowly in order to preserve the primary operation of the provision.'"[131] "Unless commanded by the text," interpretation of exceptions and their application "ought not operate to the farthest reach of their linguistic possibilities if that result would contravene the statutory design."[132]

<u>§ 1225(b)(2)(A) Exemptions</u>

Even more fundamentally, § 1225(b)(2)(A) exempts from its mandatory detention-sans-bond requirement any of those aliens arriving on land from foreign contiguous territories whether or not they arrive at designated arrival ports.[133] There is no requirement, or hint here, that these individuals must actively seek admission. Indeed, the exemption's applicability to individuals crossing at an unauthorized point suggests the opposite. As the provision addressing arrival from contiguous territory does not specify applicability to just those coming to an authorized entry point, it apparently applies textually even to aliens who made no attempt to lawfully acquire admission. This undermines the notion that such aliens already are exempt from the terms of § 1225(b)(2)(A) through its inherent scope.[134]

The remaining § 1225(b)(2) subsections underscore this textual and structural point.[135] For example, § 1225(b)(2)(A)

---

[131] *Maracich v. Spears*, 570 U.S. 48, 60 (2013) (alteration omitted) (quoting C*ommissioner v. Clark*, 489 U.S. 726, 739 (1989)).

[132] *Id.*

[133] 8 U.S.C. § 1225(b)(2)(C).

[134] *Cf. Thuraissigiam*, 591 U.S. at 108 (noting that "[a]n alien who arrives at a 'port of entry'" is arriving at "a place where an alien may lawfully enter").

[135] Structural considerations in statutory interpretation are not in tension with, or secondary to, examination of the text of the direct provision under review. Structural analysis evaluates

begins by providing that its detention instructions are subject to the limits in (B) and (C). Those subsections place aliens such as crewmen and stowaways outside the reach of the § 1225(b)(2)(A) detention terms. But aliens such as stowaways did not present themselves at the border. They, similar to aliens walking across the border undetected and staying undetected in the country's interior for years, are not actively applying for admission. The fact that Congress did the work, in the statutory text, to expressly set aside stowaways and crewmen suggests that otherwise those aliens would have fallen within the § 1225(b)(2)(B) scope. This undermines Petitioners' contention that § 1225(b)(2)(B) with its reference to "seeking admission" means to apply only to individuals actively engaged in an ongoing formal application process. If that were so, stowaways would already be outside the contours of § 1225(b)(2)(A) and Congress would not have created a statutory subsection to exempt them.

## IV

Petitioners contend, further, that even if the INA authorized Petitioners' detention without bond during adjudication of their admission, that detention violates the Constitution's Fifth Amendment Due Process Clause.[136] It does not, under the Supreme Court's precedent interpreting and applying those constitutional protections.

Under current Supreme Court doctrine, there are two distinct categories of constitutional due process protections—

---

enacted text just like the process of interpretation that occurs at the first step of analysis of a statute's plain meaning—such as examining dictionary definitions or a statutory definition for a term. Looking at the enactment context simply recognizes that all of statutory text is enacted by Congress and the President and that statutory enacted text in surrounding provisions and other portions of a statute informs how the precise subsection at issue is to be read. Simply put, "[s]tatutes must 'be read as a whole.'" *United States v. Atl. Rsch. Corp.*, 551 U.S. 128, 135 (2007) (quoting *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991)).

[136] *See* U.S. Const. amend. V ("No person shall . . . be deprived of life, liberty, or property, without due process of law . . . ."); *see also* Appellees' Br. at 49–50.

procedural and substantive. Procedural due process doctrine entitles individuals to notice and some kind of hearing prior to governmental deprivation of the individual's life, liberty, or property interest.[137] Substantive due process under the Supreme Court's jurisprudence, on the other hand, provides some type of substantive protection from a governmental restraint.[138] To identify which substantive rights fall within this range of protections, the Court looks for a history and tradition establishing the right.[139]

---

[137] *See Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) ("This Court consistently has held that some form of hearing is required before an individual is finally deprived of a property interest. The 'right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society.' The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" (citations omitted) (first quoting *Joint Anti-Fascist Comm. v. McGrath*, 341 U.S. 123, 168 (1951) (Frankfurter, J., concurring); and then quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965))). Here, that determination is whether Petitioners' continued presence in the United States is lawful.

[138] *See Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997) (observing that the Court's "established method of substantive-due-process analysis" includes identifying "fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition'" (quoting *Moore v. East Cleveland*, 431 U.S. 494, 503 (1977) (plurality opinion))).

[139] *See Glucksberg*, 521 U.S. at 721 ("[W]e have required in substantive-due-process cases a 'careful description' of the asserted fundamental liberty interest." (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993))). Under *Glucksberg*, Petitioners would need to identify a history and tradition of the substantive right to freedom from detention as non-flight or security risks. *See id.* at 721. It is not the government's burden to show the *absence of* an extra-textual substantive right to freedom from detention for certain aliens seeking legal status in the United States. *See, e.g.*, *Dep't of State v. Munoz*, 602 U.S. 899, 903 (2024) ("To establish this premise, *[the plaintiff] must show* that the asserted right is 'deeply rooted in this Nation's history

Here, the District Court found that Mr. Lopes de Andrade's detention violated what it characterized as his procedural due process rights.[140] Mr. Lopes de Andrade contends that before the Government had the power to detain him without bond, he had a right to a bond hearing to determine whether he was a flight risk or posed a danger to the community.[141] But because factors like flight risk or community danger bear no relationship to the statutory entitlement to remain in the country that Petitioners claim, the request for a hearing on those factors ultimately sounds more in substantive than procedural rights.[142]

Petitioners' claim is not that the Government must provide more safeguards, a more involved hearing, or lengthier notice to more accurately adjudicate whether Petitioners *may remain in the country*.[143] Petitioners were eligible for some proceedings, in any event—just ineligible for release on bond.[144] And multiple Supreme Court cases have indicated support for detention pending an adjudication of the alien's

---

and tradition.'" (emphasis added) (quoting *Glucksberg*, 521 U.S. at 720–21)).

[140] *See* J. App'x at 15.

[141] *See* Appellee's Br. at 51.

[142] *See Conn. Dep't of Pub. Safety v. Doe*, 538 U.S. 1, 8 (2003) ("Plaintiffs who assert a right to a hearing under the Due Process Clause must show that the facts they seek to establish in that hearing are relevant under the statutory scheme."); *cf. Rodriguez*, 180 F.4th at 740 (Wilson, J., dissenting) ("Petitioners' procedural due process claims largely collapse into substantive due process because they assert a right to procedure that is absent from the statutory text.").

[143] *See* Appellees' Br. at 51; *see also Landon v. Plasencia*, 459 U.S. 21, 34 (1982) (observing that under the *Mathews v. Eldridge* framework, "[i]n evaluating the procedures in any case, the courts must consider the interest at stake for the individual, the risk of an erroneous deprivation of the interest through the procedures used as well as the probable value of additional or different procedural safeguards, and the interest of the government in using the current procedures rather than additional or different procedures").

[144] *See* 8 U.S.C. § 1225(b)(2)(A); *id.* § 1229a(a)(1).

legal entitlement to remain in the United States.[145] Consequently, Petitioners' contention essentially distills to the argument that the Government may not, as a substantive matter, detain pre-admission aliens with no demonstrated flight risk or community danger.[146] But that is not the system Congress created.[147] And Petitioners make no attempt to show a history or tradition of a constitutional right to release into the United States on bond during adjudication of an alien's claims to legal presence in the United States.[148] The history of claims before the Supreme Court actually shows the opposite.[149]

**A**

Ultimately, whether procedural or substantive due process is at stake here, Mr. Lopes de Andrade has not

---

[145] *See, e.g.*, *Demore*, 538 U.S. at 531 ("Detention during removal proceedings is a constitutionally permissible part of that process."); *Wong Wing v. United States*, 163 U.S. 228, 235 (1896) ("We think it clear that detention or temporary confinement, as part of the means necessary to give effect to the provisions for the exclusion or expulsion of aliens, would be valid."); *Landon*, 459 US at 32 ("This Court has long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative.").

[146] *See* Appellees' Br. at 54–55 ("Mr. Lopes de Andrade's no-bond detention also violates substantive due process because it imposes detention not reasonably related to a legitimate government interest—namely, the prevention of flight or protection of public safety."); *see also* J. App'x at 15.

[147] *See, e.g.*, 8 U.S.C. § 1225(b)(2)(A) ("[I]n the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien *shall* be detained for a proceeding under section 1229a of this title." (emphasis added)).

[148] *See* Appellees' Br. at 55.

[149] *See, e.g.*, *supra* note 145; *see also Carlson v. Landon*, 342 U.S. 524, 538 (1952) ("Detention is necessarily a part of this deportation procedure."); *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 216 (1953).

established that his detention during removal proceedings violates either. Procedural due process protections apply to ensure that one receives a fair, accurate adjudication of their ultimate legal interests—here, whether they may remain in the United States.[150] Those protections do not *constitutionally* guarantee Petitioners the right to adjudicate unrelated questions—ones Congress didn't deem relevant—such as flight and security risk. All that matters is the Petitioners fall within the class of people that Congress has decided should be mandatorily detained.[151] Any argument that Congress's determination was constitutionally infirm rings more in *substantive* due process.

Indeed, under both § 1225(b)(2)(A) and § 1229a, immigration detention does not turn on a demonstrated absence of flight risk or dangerousness. The statute commands detention if the alien is an "applicant for admission" and the examining officer "determines that the alien is not clearly and beyond a doubt entitled to be admitted."[152] The escape valve is discretionary parole under § 1182(d)(5)(A), which is administered case-by-case only "for urgent humanitarian reasons or significant public benefit."[153] A bond hearing focused on flight risk and dangerousness would generate irrelevant facts, not material to individual determinations under

---

[150] *See Landon*, 459 U.S. at 34 ("In evaluating the procedures in any case, the courts must consider . . . the probable value of additional or different procedural safeguards"); *O'Bannon v. Town Ct. Nursing Ctr.*, 447 U.S. 773, 797 (1980) (Blackmun, J., concurring in the judgment) ("Procedural due process seeks to ensure the accurate determination of decisional facts . . . ..").

[151] *See Doe*, 538 U.S. at 4 ("[D]ue process does not require the opportunity to prove a fact that is not material to the State's statutory scheme.").

[152] 8 U.S.C. § 1225(b)(2)(A).

[153] *Id.* § 1182(d)(5)(A) (authorizing the DHS Secretary "in his discretion" to temporarily parole aliens "applying for admission to the United States" on these limited conditions and specifying this is temporary status that "shall not be regarded as an admission of the alien" and that following the termination of parole status the alien shall be treated "in the same manner as that of any other applicant for admission to the United States"); 8 C.F.R. § 212.5(b) (implementing case-by-case parole criteria).

the § 1225(b)(2)(A) and § 1229a detention scheme—a scheme designed to keep aliens who have never received any adjudication of lawful U.S. presence from release into the country without demonstrated legal entitlement.[154]

**B**

More substantively, in *Demore v. Kim*—a case involving criminal alien detention under § 1226(c)—the Supreme Court previously suggested that Fifth Amendment due process principles extend to aliens in *deportation* proceedings.[155] But "[d]etention during removal proceedings is a constitutionally permissible part of that process."[156] And here, Petitioners arguably have less of a significant protected interest than the aliens in *Demore* because they have never received any determination of lawful presence.[157]

The Supreme Court has repeatedly indicated there is no general right to freedom from detention during removal proceedings.[158] And on the merits of the ultimate question of lawful status, the Supreme Court "has long held that an alien

---

[154] *Cf.* 8 U.S.C. § 1225(a)(1) (designating as "applicant[s] for admission" any "alien present in the United States who has not been admitted or who arrives"); *Doe*, 538 U.S. at 8 ("Plaintiffs who assert a right to a hearing under the Due Process Clause must show that the facts they seek to establish in that hearing are relevant under the statutory scheme.").

[155] *Demore*, 538 U.S. at 531 (discussing *Flores*, 507 U.S. at 306)); *see Flores*, 507 U.S. at 306 ("It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings.").

[156] *Demore*, 538 U.S. at 531; *see also id.* at 524 (discussing how the Government "could deny bail to the detainees 'by reference to the legislative scheme' even without any finding of flight risk" (quoting *Carlson*, 342 U.S. at 543)); *Carlson*, 342 U.S. at 538 ("Detention is necessarily a part of [a] deportation procedure.").

[157] *See* Appellant's Br. at 2 ("Petitioners entered the country without inspection, [and] were never 'admitted,' . . ."); *cf. Demore*, 538 U.S. at 513 ("[Kim] entered the United States in 1984, at the age of six, and became a lawful permanent resident of the United States two years later.")

[158] *See supra* note 145.

seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative."[159]

Detention pending removal generally serves the purpose of preventing "aliens from fleeing prior to or during their removal proceedings" and increases the likelihood of successful removal.[160] When crafting procedures adjudicating the status of "deportable aliens, the Due Process Clause does not require [Congress] to employ the least burdensome means to accomplish its goal."[161] Under the "longstanding view" of the Supreme Court, "the Government may constitutionally detain deportable aliens during the limited period necessary for their removal proceedings."[162] The Supreme Court has underscored in recent cases involving admission and removal authority that "the Constitution gives 'the political department of the government' plenary authority to decide which aliens to admit."[163] "[C]oncomitant" with that authority is "the power to set the procedures to be followed in determining whether an alien should be admitted."[164]

---

[159] *Landon*, 459 U.S. at 32.

[160] *Demore*, 538 U.S. at 528; *see also Wong Wing*, 163 U.S. at 235 ("Proceedings to exclude or expel would be vain if those accused could not be held in custody pending the inquiry into their true character, and while arrangements were being made for their deportation.").

[161] *Demore*, 538 U.S. at 528; *see also Carlson*, 342 U.S. at 543 ("In carrying out that policy the Attorney General is not left with untrammeled discretion as to bail. Courts review his determination. Hearings are had, and he must justify his refusal of bail by reference to the *legislative scheme* to eradicate the evils of Communist activity." (emphasis added)); *Landon*, 459 U.S. at 35 (rejecting the concept that the judicial role is to "impos[e] procedures that merely displace congressional choices of policy").

[162] *Demore*, 538 U.S. at 526; *see also supra* note 145.

[163] *Thuraissigiam*, 591 U.S. at 139 (quoting *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892)).

[164] *Id.* The Court has noted that deference in this area is important given that "any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and

Hoping to sidestep this principle from *Demore*, Petitioners attempt to rely on *Zadvydas v. Davis*, 533 U.S. 678 (2001), where the Supreme Court addressed the distinct question of whether aliens not removable to an appropriate country may be indefinitely detained while remaining within the United States.[165] Although the Court interpreted the relevant statute to authorize less-than-boundless detention time to avoid potential due process tension, the Court specifically identified a detention time period of six months as permissible after an alien was deemed inadmissible or removable.[166]

The *Zadvydas* Court essentially proffered a presumption that detention of a removable alien was constitutional for at least six months. But, crucially, the Court was considering the issue in the context of a post-removal determination where there were concerns whether the alien could ever be removed to any country from detention. Those facts do not exist here. This is not a case where "there is no significant likelihood of removal in the reasonably foreseeable future."[167] By comparison, both Petitioners in this case were detained for fewer than 90 days before the District Courts ordered their release.[168] And the Government simply contends it has power to follow a mandatory detention statute for "the limited period necessary for [Petitioners'] removal proceedings," a duration upheld as constitutional in the criminal-alien context in *Demore*.[169]

### C

In the alternative, twenty States and the District of Columbia, as amici curiae, contend that Supreme Court precedent establishes a general rule that the Due Process Clause categorically forbids civil detention absent an

---

the maintenance of a republican form of government." *Demore*, 538 U.S. at 522 (quoting *Mathews v. Diaz*, 426 U.S. 67, 81 n.17 (1976)).

165 Appellees' Br. at 54–55.

166 *See Zadvydas v. Davis*, 533 U.S. 678, 701 (2001).

167 *Id.*; *see also Demore*, 531 U.S. at 530–31 (rejecting a due process claim of a deportable alien who had spent six months in immigration custody pending removal proceedings when he "himself had requested a continuance of his removal hearing").

168 *See* Appellant's Br. at 18–19.

169 *Demore*, 538 U.S. at 526.

individualized determination that a detainee poses a danger to the community or a risk of flight.[170] But that argument drawn from the Court's line of cases on civil commitment and criminal pretrial detention[171] is inapposite to this detention context involving aliens.

As the Supreme Court has observed, Congress and the President routinely establish immigration procedures for processing removal and detention that are not analogous to procedures in the civil domestic context for United States citizens.[172] The plenary authority of the political branches to set policy governing admission and removal of aliens is a longstanding feature of our constitutional system and the separation of powers.[173] The power to protect sovereignty via the removal authority rests in the political departments that necessarily, then, have some control over its contours and the

---

[170] *See* Brief for States of California et al. as Amici Curiae in Support of Appellees at 1, 18–28, *Buele Morocho v. Warden Phila. FDC*, Nos. 26-1150 & 26-1454 (3d Cir. Apr. 20, 2026).

[171] *Id.* at 22–23 (citing *United States v. Salerno*, 481 U.S. 739 (1987) (bail); *Foucha v. Louisiana*, 504 U.S. 71 (1992) (civil commitment of those deemed not guilty by reason of insanity); *Kansas v. Hendricks*, 521 U.S. 346 (1997) (civil commitment of sexual offenders); and *Addington v. Texas*, 441 U.S. 418 (1979) (involuntary civil commitment to a mental hospital)).

[172] *See Demore*, 538 U.S. at 521 (noting that in the immigration context, "Congress regularly makes rules that would be unacceptable if applied to citizens" (quoting *Mathews*, 426 U.S. at 80)).

[173] *See, e.g.*, *Chae Chan Ping v. United States*, 130 U.S. 581, 603–04 (1889) ("That the government of the United States, through the action of the legislative department, can exclude aliens from its territory is a proposition which we do not think open to controversy. Jurisdiction over its own territory to that extent is an incident of every independent nation. It is a part of its independence. If it could not exclude aliens it would be to that extent subject to the control of another power."); *Demore*, 538 U.S. at 522 (noting that important policymaking role relates to the manner in which "any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government" (quoting *Mathews*, 426 U.S. at 81 n.17)).

procedures by which removal is carried out.[174] According to repeated pronouncements by the Supreme Court, federal legislative power is at its crest when regulating admission of aliens, a policy matter critical to national interests and protection of inherent national sovereignty.[175]

## V

For the foregoing reasons, I respectfully dissent. The District Courts should not have prematurely released Petitioners under the terms of IIRIRA, Supreme Court precedent, and the constitutional due process principles established by the Supreme Court. I would reverse the orders of the District Courts and remand for further proceedings consistent with this dissent.

---

[174] *See United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950) ("The exclusion of aliens is a fundamental act of sovereignty. The right to do so stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation."); *Fong Yue Ting v. United States*, 149 U.S. 698, 713 (1893) ("The power to exclude or to expel aliens, being a power affecting international relations, is vested in the political departments of the government . . . .").

[175] *See Fallo v. Bell*, 430 U.S. 787, 792 (1977) ("This Court has repeatedly emphasized that 'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." (quoting *Oceanic Navigation Co. v. Stranahan*, 214 U.S. 320, 339 (1909))); *cf. Thuraissigiam*, 591 U.S. at 139 (concluding, in the distinct case where aliens are just inside or at the border and have not yet acquired any legal status in the country, that their procedural interests are simply entitlement to whatever process Congress has established for adjudicating whether the alien has a right to admission or entry).